# In re D.K.

C.P. of Northumberland County, no. JU-02-205.

*Michael J. Robinson,* for CYS.
*James J. Rosini,* for minor, D.K.
*John Broda,* for Donna K.

SAYLOR, *J.,* July 10, 2002—The unusual question in this proceeding as to whether the minor should be adjudicated as a dependent child arises from the fact that the referral was originally received by Northumberland County Children and Youth Services from a physician at Geisinger Medical Center due to the minor's morbid obesity, with its physical and psychological consequences, including depression and social isolation. At the time of the referral in early April 2002, the 16-year-old minor weighed 451 pounds, even though he was only 5' 3" tall. Moreover, he was in the unfortunate circumstances where he was being raised alone by his mother, who had herself become homebound as the result of her own obesity, allegedly in the 600-pound range, and as a result, she had obvious limitations as to any type of usual activity.[1] In fact, she did not even attend medical appointments with her son because of her own obesity.

---

1. D.K.'s father died at the age of 37 of a myocardial infarction.

Although the minor had a long history of being overweight back into his infancy, the minor was never taken by his parents to see a dietician. In the past year, he had gained over 100 pounds. As the result of concern on the part of school officials, not only as to his weight but also his poor performance and absenteeism, the minor was evaluated on April 8, 2002, in the pediatric gastroenterology department of Geisinger Medical Center. The minor's health situation had reached, in the terms of his examining physician, a "life threatening situation," which required his admission to the hospital. The principal diagnosis was that of morbid obesity, with the following resulting complications:

(1) An enlarged liver as a precursor to cirrhosis of the liver;

(2) Hypertension;

(3) Respiratory problems to the extent that he required oxygen at night;

(4) Insulin resistance that places him at a high risk for diabetes;

(5) Sleep apnea; and,

(6) Knee pain.

It was also confirmed that he was suffering from a depressive disorder. He reported spending nine hours a day sitting before the television or a computer screen, with few friends.

Upon receipt of the referral on April 12, 2002, from the physicians at Geisinger Medical Center, CYS obtained from the mother a voluntary entrustment agreement placing D.K. in the care and custody of CYS. The

minor was placed on a very specific, physician-supervised diet, as well as a directive to engage in regular exercise, such as walking.[2] This is all now being accomplished in the home setting of his foster parents. By the time of the hearing held by this court on July 2, 2002, the minor had lost 50 pounds in three months.

The minor has now expressed a strong desire to return home, as he now relates that his new eating habits are now ingrained; that he believes he could now shop and prepare his meals, with some assistance of his mother; and that there are more recreational activities near his home than where his foster parents reside. He also wants to be reunited with friends at his former school. His mother also would like to see him return home at this time, and she stated that she would keep him on his diet.

The medical testimony, by a board certified pediatric nutritionist, is that the diet is one that could be monitored in a home setting; however, he did not believe that the mother here with her limitations as noted above would provide the necessary help and support the minor needs in order to avert a return to his former lifestyle, and if this occurs, the minor then has a "guarantee" of a short life span of only reaching his 30s, with physical problems of liver and heart disease, diabetes and sleep apnea. According to this specialist, it was of critical importance for the minor to have the proper support and reinforcement from his caretaker.

2. He is required to perform an aerobic exercise for at least 30 minutes a day.

As we turn to the Juvenile Act, the most common category of the definitions for a "dependent child" is set forth in 42 Pa.C.S. §6302(1), as follows:

"A child who (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals."

This has been further explained to mean that "the Act limits the Commonwealth's coercive interference with the family unit to those cases where the parents have not provided 'a minimum standard of care for a child's physical, intellectual and moral well-being.' ... [P]arental care which is both 'necessary' and 'proper' is not the best care possible but that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child." *In the Interest of Pernishek,* 268 Pa. Super. 447, 458, 408 A.2d 872, 877-78 (1979). As further explained in *In the Matter of Yeager,* 309 Pa. Super. 491, 496, 455 A.2d 717, 719 (1983), "the compelling consideration is the ability and willingness of the parent or parents to provide necessary and proper care according to the special needs of their child or children." Thus, it does not require a finding by this court of parental fault prior to an adjudication of dependency. The question here is not the capability of the parent for caring for a normal child, but whether she can provide the required level of support and reinforcement required for her child's specialized needs. *In the Matter of Yeager, supra.*

The specialized needs of the minor here are to lose sufficient weight to take him out of the morbid obesity

category, and thus alleviate his related physical and mental problems. This is an extreme case, and certainly CYS would not be justified by intervening simply because a child was overweight, or did not simply engage in a healthy and fit lifestyle. Rather, the obesity must be of a severe nature reaching the life threatening or morbid state, which has also manifested itself in physical problems, such as those present here, or mental problems.

If a child does not receive necessary medical care for a health problem, there is usually no difficulty in a court making a finding of dependency, and especially in the situation where a child was malnourished to the point of near starvation. Cf. *Commonwealth v. Cottam,* 420 Pa. Super. 311, 616 A.2d 988 (1992). This situation here is on the other end of the nourishment spectrum, but it is no less dangerous to the child's physical and mental well-being. In light of the medical testimony presented as to the present physical condition of the minor, this court finds that CYS has established by clear and convincing evidence that he is a dependent child at this time.

The inquiry now turns to whether the minor should continue to remain separated from his mother under these circumstances. The standard to guide this determination was set forth in *In the Interest of Whittle,* 263 Pa. Super. 312, 316, 397 A.2d 1225, 1226 (1979):

"The purpose of the Juvenile Act is to preserve, whenever possible, the unity of the family; children should be separated from their families only in cases of *clear necessity.* . . . Even where there are inadequacies in the child's home, the court should first consider ordering CWS to take the steps necessary to instruct the parents

in the skills needed, and to provide follow-up supervision in the home, where feasible." (emphasis added) (citations omitted)

In *In the Interest of Pernishek, supra,* the parents were evaluated as to their ability to provide the necessary care for their 9-year-old child diagnosed as a psychosocial dwarf. There was conflicting expert opinion as to whether specialized institutional care was required, and even if it would be successful, and, thus, further hearings were required as to the child's progress to be held every three months. In the *Whittle* case, it was determined that the parents, with proper training and supervision, could adequately and properly care in their own home for the special care required of their daughter's serious burns.

Unlike those parents, the mother here does not have the natural abilities typical of any parent, as she is limited by her own extreme obesity. Her own problems interfere with her ability to meet the special needs of her son. She is homebound, and this prevented her from even attending her son's medical appointments, so as to be fully advised as to the seriousness of his condition. Since she did not go to the hospital during his six days as an inpatient there, it is unlikely that she fully appreciates her son's situation at this time. Despite his obesity from the age of 3, and his weight gain of over 100 pounds in the past year, there is no evidence that she did anything to address his problem. She never took him to a dietician or other specialist.

It is also troubling that she apparently did little or nothing regarding her son's declining performance in school, and his absenteeism. The minor indicated that he simply

did not go to school when he did not feel like it. There is no indication by him of any parental involvement as to this determination by him. She has been unable to maintain her own health by addressing her own obesity problem, and therefore it is highly unlikely that she will now be able to do so with regard to her son's identical problem.

It has only been since his hospitalization and placement in foster care that his obesity is now being addressed, and his physical condition has been improving. Thus, there is a clear necessity for him to remain in foster care at the present time. However, as in *Pernishek, supra,* this is a case that will require constant monitoring to ensure that the placement continues to work toward restoring the minor's health and only lasts as long as absolutely necessary. Once the mother can demonstrate her ability to offer the required assistance and support to her son, and the new eating habits, education, and exercise programs become more ingrained and of a habitual nature for the minor, then the goal of reunification can be achieved.

With regard to reunification, it is recommended that the minor obtain access by a membership in a youth oriented fitness facility such as the YMCA for continuing reinforcement, and involvement with a mentoring program such as Big Brothers/Big Sisters. Further review of this matter should be scheduled by a hearing to be held no later than every three months.

Accordingly, we enter the following order:

## ORDER

And now, July 10, 2002, it is ordered and directed that:

(1) With the child's health and safety as the paramount concern, the court finds that reasonable efforts were made to preserve and reunify the family prior to the placement of the child.

(2) That D.K. is adjudicated dependent by reason of being without proper parental care or control necessary for his physical, mental and emotional health.

(3) That legal and physical custody of D.K. is awarded to Northumberland County Children and Youth Services and that he is hereby placed in a children and youth services approved facility until further order of the court.

(4) That removal of D.K. from the home was the result of a determination that continuation therein would be contrary to the health, welfare and safety of the child and that reasonable efforts were made by the agency to preserve and reunify the family.

(5) That Northumberland County Children and Youth Services will ensure that the opportunity for visits between the child and his mother will be provided at least twice every week, unless such are not in keeping with the service objectives or placement goals.

(6) (a) That D.K. obtain and maintain a healthy weight and lifestyle before returning home to the care of the natural mother.

(b) That D.K. obtain and maintain a membership in a fitness facility, and participate in a mentoring program.

(7) That Donna K. attends all D.K.'s medical appointments.

(8) That Donna K. cooperates with a resource worker for help with nutrition.

(9) That Donna K. provide the appropriate foods in the home and prepare them as required by the diet as part of her visitation with D.K.

(10) That Donna K. supports D.K. in his efforts to lose weight.

(11) That Donna K. provide a safe, stable, and healthy home environment for the minor child.

(12) That Donna K. attend counseling with D.K. as required by the therapist and follow all recommendations of the therapist.

(13) That Donna K. will address her own health concerns and well-being in order to care for D.K.

(14) That Donna K. will cooperate with Northumberland County Children and Youth Services and follow all recommendations.

(15) That Northumberland County Children and Youth Services be permitted to release pertinent information regarding this matter to all appropriate treating professionals and agencies.

(16) Because good cause for such disclosure has been shown to the court, that all educational, drug and alcohol, psychological and medical records (including all diagnostic tests, evaluations, treatment notes, treatment plans, summaries, conclusions and recommendations) from all treating facilities and professionals, including but not limited to: Shikellamy School District, Dr. Cochran, Northumberland County Mental Health and Mental Retardation, Dr. Fabian, Sun Home Health Serv-

ices, Geisinger Medical Center, Sunbury Community Hospital pertaining to Donna and D.K. be released to children and youth services for the purpose of assessment, ongoing monitoring, and the court's review; material to be released is to include all present information and future until further order of the court.

(17) That the name and address of the foster parents not be released unless approved by children and youth services.

(18) That in the event of extended placement, Northumberland County Children and Youth Services shall ensure that the child receive a permanency hearing and placement review before the end of the third, sixth and ninth month of continuous placement of the child and each three months thereafter.