In the Matter of A.K. and L.K.

Appeal of C.P.K.

In the Matter of L.K., A Minor.

Appeal of C.P.K., Natural Father.

In the Matter of A.K., A Minor.

Appeal of C.P.K., Natural Father.

Superior Court of Pennsylvania.

Submitted June 25, 2007.

Filed Oct. 29, 2007.

Kathleen K. Shaulis, Carlisle, for C.P.K.

Megan A.E. Riesmeyer, Carlisle, for mother, appellee.

Ruby D. Weeks, Carlisle, for Cumberland County, appellee.

Jacqueline M. Verney, Carlisle, Guardian Ad Litem.

BEFORE: TODD, BOWES and McCAFFERY, JJ.

OPINION BY McCAFFERY, J.:

¶ 1 Appellant, C.P.K. ("Father"), appeals from the trial court's orders changing the placement goal for his dependent twin daughters to adoption.[1] Father asks us to determine whether the trial court erred in granting the placement goal change when Father, although incarcerated, had made substantial progress toward his permanency plan goals and had an emotional bond with his children. Following careful review, we affirm.

¶ 2 The facts and procedural history of the instant case have previously been summarized by this Court as follows:

On June 4, 2004, A.K. and L.K., who were both born [prematurely on February 4, 2004,] were placed on an emergency basis with the Cumberland County Children and Youth Services (the Agency) because of suspected physical abuse. Over the months that followed, several hearings were conducted before the dependency master. On January 12,

---

1. The November 29, 2006 order changed the placement goal for the children to adoption and permitted visitation by the children's mother and paternal grandparents. The orders of January 9, 2007, reiterated the goal change and also stated that services to the parents were no longer required.

2005, the trial court approved the master's report and adopted his recommendations that: (1) the children were abused; (2) they were dependent; (3) Father perpetrated the abuse; (4) Mother was responsible for the abuse by omissions; and (5) aggravated circumstances existed as to both parents.[2]

Both Mother and Father appealed the trial court's dependency adjudication.... This Court affirmed the trial court's dependency adjudications in an unpublished memorandum. *In re A.K. and L.K.*, 894 A.2d 828 (Pa.Super.2005). Both parents were eventually convicted of child endangerment charges in connection with [the children's injuries]. Mother received an aggregate term of four to twelve months of incarceration.... Father was sentenced to serve an aggregate term of three to ten years of imprisonment in a state correctional institution. On November 30, 2005, a permanency hearing was held, and at its conclusion, the [placement] goal with regard to each child was changed from reunification to adoption. At this hearing, Father continued to deny that he intentionally harmed the girls. According to Father, he admitted causing their injuries, but stated that he had fallen while holding them or that he played a little too "rough" with them. Mother maintained that she believed Father's explanation for the injuries, although, in hindsight, she should have taken the girls for treatment.

*In re A.K.*, 906 A.2d 596, 598–99 (Pa.Super.2006) (footnote added).

¶ 3 Mother and Father appealed the goal change to adoption, arguing that the trial court erred in granting the change when the parents had completed all or nearly all of their permanency plan and in failing to consider the parent-child bond. *Id.* at 599. In an opinion filed on August 17, 2006, this Court reversed, concluding, *inter alia*, that review of the record did "not support the trial court's conclusion that progress toward 'alleviating the circumstances which necessitated the original placement' [had] not been made." *Id.* at 600. More specifically, the reasoning of the panel was as follows:

> Both parents accepted responsibility for their actions or inactions by pleading guilty to the child endangerment charges. While Father maintained that he did not intentionally harm his children and the court chose to disbelieve him, we note that Father has been sent to prison for three to ten years. He does not pose, therefore, a continuing threat to them.... Mother testified that, although she believed Father's explanations at the time of the injuries, in hindsight, she should have taken the girls to the hospital for treatment. Additionally, Mother testified that, if the children were returned to her, she would comply with any conditions that the Agency would require, even ceasing contact with Father if need be.

\* \* \* \*

Because we conclude that the trial court erred in assigning the parent[s'] failure to admit that they intentionally abused their children determinative weight, we

2. The injuries to the four-month old girls at the time of emergency placement were substantial. Both had extensive bruising on the face and body, as well as dried blood under the fingernails and toenails. A.K. had 18 fractures of the ribs, 12 fractures of the extremities, and a possible skull fracture. L.K. had 17 fractures of the ribs. Several physicians testified that, in their opinion, the majority if not all of the injuries had been intentionally caused. *In re A.K.*, 906 A.2d 596, 598 (Pa.Super.2006) (citing the Trial Court Opinion, March 2, 2006, at 2).

reverse the order of the trial court and reinstate the goal of reunification. ....
As to the other factors pertinent to a permanency review, the trial court found that Mother was successful in meeting the requirements of her permanency plan. Moreover, those who observed Mother's interaction with her children testified at previous hearings that her parenting skills were completely appropriate and that a parental bond was evident. Finally, it is undisputed that Mother has been released from prison and has a support system in place to assist her in raising her children. Thus, the record supports the conclusion that the Agency should continue efforts to reunite *her* with them.

*Id.* at 600–01 (internal citations omitted) (emphasis added).

¶ 4 After reversal and remand, the next permanency hearing was held on November 29, 2006. Prior to this hearing and via testimony at the hearing, Mother made clear that she had decided to relinquish her parental rights to her daughters and to allow them to be adopted because she was unable to give the children what they need. (Notes of Testimony ("N.T."), 11/29/06, at 27–30). Immediately following the hearing, the trial court again changed the children's placement goal to adoption. As the trial court explained, "[t]he driving force behind the goal change was [M]other's desire to have the children adopted by the foster parents with whom they have lived for the vast majority of their lives." (Trial Court Opinion, dated February 26, 2007, at 3).

¶ 5 Father has now appealed the goal change to adoption, raising the following five issues for our review:

I. Whether the trial court abused its discretion and erred as a matter of law in changing the goals of the children from reunification with Father to adop-

tion after the Superior Court reversed the prior goal change to adoption under the facts of the case reported in *In The Matter of A.K. and L.K.,* 906 A.2d 596 (Pa.Super.2006).

II. Whether the trial court abused its discretion and erred as a matter of law in finding that Father is not "in compliance with his permanency plan" in its January 9, 2007 order contrary to the finding of fact made by it previously on November 30, 2005 in *In The Matter of A.K. and L.K.,* 906 A.2d 596 (Pa.Super.2006).

III. Whether the trial court abused its discretion and erred as a matter of law by stating in its January 9, 2007 order that Father is not "making progress in alleviating the circumstances which necessitated the placement" when the Superior Court previously reversed the trial court on this same point in *In The Matter of A.K. and L.K.,* 906 A.2d 596 (Pa.Super.2006) on [August 17,] 2006.

IV. Whether the trial court abused its discretion and erred as a matter of law in changing the children's goals from reunification without considering the existing bonds between Father and the children prior to changing the goals.

V. Whether the trial court abused its discretion and erred as a matter of law in not moving forward to place the children with Paternal Grandparents when following the decision in *In The Matter of A.K. and L.K.,* 906 A.2d 596 (Pa.Super.2006), the trial court's July 25, 2006 order recognized Paternal Grandparents to be a resource for placement of the children.

(Father's Brief at 15).

 ¶ 6 We note first our standard of review:

When we review a trial court's order to change the placement goal for a depen-

dent child to adoption, our standard is abuse of discretion. In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias or ill will, as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm even if the record could also support an opposite result.

*In re N.C.,* 909 A.2d 818, 822–23 (Pa.Super.2006) (citations and quotation marks omitted).

■■■ ¶ 7 Next, we note that in matters of placement for a dependent child, the trial court must be guided by the best interests of the child—not those of his or her parents. *Id.* at 823.

Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act,[3] which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA").[4] The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over *all* other considerations, including the rights of the parents.

At each review hearing for a dependent child who has been removed from the parental home, the court must consider the following, statutorily-mandated factors:

> the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved. [42 Pa.C.S.A. § 6351(f) ].

\* \* \* \*

When the child welfare agency has made reasonable efforts to return a foster child to his or her biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home. This Court has held that the placement process should be completed within 18 months.

\* \* \* \*

While this 18–month time frame may in some circumstances seem short, it is based on the policy that a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

---

**3.** 42 Pa.C.S.A. §§ 6301–65.

**4.** 42 U.S.C. § 671 *et seq.*

*N.C., supra* at 823–24 (citations and quotations omitted; footnotes in original).

¶ 8 With these principles in mind, we turn now to the case *sub judice.* In Father's first issue, he contends that the trial court erred in changing the children's placement goal to adoption because the trial court was "bound" to follow this Court's prior decision that "a goal change is not appropriate in the instant case." (Father's Brief at 21). Father has misread our prior opinion and misinterpreted the governing statutes.

¶ 9 At *each* permanency hearing, the court is required to reassess the permanency plan for and placement of the dependent child and to consider all of the statutory factors relevant to that reassessment. *See* 42 Pa.C.S.A. § 6351(e)-(f.2); *N.C., supra* at 823. Our prior opinion most certainly did not—indeed *could not*—circumscribe the basic responsibility of the orphans' court to reconsider the dependent children's placement goal in light of any future developments or events that affect the children.

¶ 10 In this case, at the November 2006 placement hearing, the court was faced with a dramatic development—Mother's realization that she could not provide for her daughters' needs and her consequent determination to place them for adoption. Father's view that our prior opinion somehow precluded the orphans' court from changing the children's placement goal based on this new and highly significant development is simply contrary to controlling law as well as to the text of the prior opinion. Father's first issue thus merits no relief.

¶ 11 In Father's second issue, he contends that the trial court erred in changing the placement goal to adoption when the court had previously determined that prior to his incarceration, Father had completed most of the goals of his perma-

nency plan. Father has neglected to consider several factors which render his contention meritless.

¶ 12 Most importantly, Father has failed to realize that the focus of all dependency proceedings, including change of goal proceedings, must be on the safety, permanency, and well-being of the child. The best interests of the child take precedence over all other considerations, including the conduct and the rights of the parent. *N.C., supra* at 823–24. Consistent with this focus, our case law has established that, while parental progress toward completion of a permanency plan is an important factor, it is not to be elevated to determinative status, to the exclusion of all other factors. *See N.C., supra* at 824–27. When circumstances are such that the best interests of the child dictate a goal change to adoption, then the trial court acts well within its authority to order the goal change—even if the parent has made substantial progress toward completion of his or her permanency plan. *Id.* at 826–27.

¶ 13 Father also ignores the fact that he is presently incarcerated and will remain so at least until November 2008. Thus, the progress that Father made on his permanency plan prior to his incarceration must be measured against the reality of his circumstances at present, which are that Father is unable to provide for any of the needs of his children with regard to housing, other basic necessities, and day-to-day love, emotional support and guidance. While Father's efforts in cooperating with the Agency and working toward his permanency plan goals may deserve credit, Father's other actions—leading to serious injury of his daughters—have resulted in his lengthy imprisonment.

¶ 14 The trial court properly took *all* of the statutory factors into account and based its decision concerning the place-

ment goal on the children's best interests. The trial court was appropriately concerned with permanency for the children, noting that they have been in the same safe and loving foster home, where they have thrived, for nearly all of their lives. The court also noted that Father would be in prison for at least two more years and possibly as many as nine more years. Under the circumstances of this case, we cannot conclude that the trial court abused its discretion by declining to give determinative weight to the fact that Father had made substantial progress toward his permanency plan prior to his incarceration. Father's second issue thus affords no basis for relief.

¶ 15 In Father's third issue, he contends that the trial court ignored this Court's directive by continuing to find that Father had not made progress toward alleviating the circumstances that had led to the children's original placement. The particular area of "progress" in dispute is Father's acknowledgement of his involvement in the injuries to his infant daughters. Father's position has been and continues to be that he caused most of the children's injuries, but did so accidentally, by falling with them and by handling them too roughly, not by intentionally harming them.

¶ 16 When changing the placement goal to adoption the first time, the trial court determined that both parents remained in denial over the true cause of the children's injuries, that Father remained a threat to abuse the children, and that Mother remained a threat insofar as she might continue to allow the abuse to happen; the trial court therefore concluded that the parents could not provide a safe environment for their children. *A.K.*, 906 A.2d at 600 (citing Trial Court Opinion, March 2, 2006, at 4). This Court, upon review of the record, concluded that the trial court's

decision was not supported by the undisputed facts of the case. As Father has pointed out, the panel reasoned that, contrary to the trial court's conclusions, both Father and Mother had "accepted responsibility for their actions or inactions" via their guilty pleas to the child endangerment charges. *Id.*

¶ 17 However, by focusing only on the sentence above and ignoring other portions of the panel's reasoning, Father has failed to grasp the meaning of this Court's prior ruling. Relevant excerpts ignored by Father are the following:

> While Father maintained that he did not intentionally harm his children and the court chose to disbelieve him, we note that Father has been sent to prison for three to ten years. *He does not pose, therefore, a continuing threat to them.*
>
> \* \* \* \*
>
> [T]he trial court found that Mother was successful in meeting the requirements of her permanency plan. Moreover, those who observed Mother's interaction with her children testified at previous hearings that her parenting skills were completely appropriate and that a parental bond was evident. Finally, it is undisputed that Mother has been released from prison and has a support system in place to assist her in raising her children. Thus, the record supports the conclusion that the *Agency should continue efforts to reunite* ***her*** *with them.*

*Id.* at 600–01 (internal citations omitted) (emphasis added).

¶ 18 As the above excerpts make clear, when we consider this Court's *entire* previous opinion, not just the portions favored by Father, we must conclude that Father's argument as to the court's view of his progress has no merit. Our prior opinion

did *not* refute the trial court's credibility determinations as to Father's intent and his continuing potential to harm the children. Rather, the panel concluded that Father was not a continuing threat *because he was in prison* for three to ten years. The panel then directed its focus toward Mother: on *her* success in meeting the goals of her permanency plan, on *her* interactions and bonding with the children, on *her* parenting skills, and on *her* support system. Finally, the panel concluded that the Agency should continue efforts to reunite *Mother* with her children. Father is not mentioned in the panel's consideration of and conclusions with respect to these numerous positive factors; all relate only to Mother and her interactions with the children. Thus, we conclude that Father's interpretation of this Court's prior opinion cannot be supported.

¶ 19 In addition, we must point out that Father's progress, or lack thereof, in alleviating the circumstances that led to his daughters' original placement was not a major factor in the trial court's decision to change the placement goal to adoption. (*See* Trial Court Opinion, dated February 26, 2007). The trial court made clear that the "driving force behind the goal change [to adoption] was [M]other's desire to have the children adopted by the foster parents." (*Id.* at 3). Given Mother's decision, the trial court concluded that a placement goal of "return home" was no longer appropriate or even feasible, not least because Father faced at least two and possibly nine more years in prison. (*Id.* at 5). The trial court explained that it sought to ensure permanency for the children in the safe and loving environment where they have spent most of their young lives. (*Id.*) To require instead that these young children wait for a permanent home, which Father may or may not be able to provide when, some indeterminable number of years hence, he is released from prison,

was not, in the trial court's view, sensible or compatible with the Adoption and Safe Families Act. (*See* N.T., 11/29/06, at 60). Because our careful review of the record reveals no error or abuse of discretion by the trial court in reaching this decision, Father's third issue must fail.

¶ 20 In Father's fourth issue, he argues that the trial court erred in changing the placement goal to adoption without considering the bonds between Father and the children. As we discussed *supra*, the focus of all dependency proceedings, including change of goal proceedings, must be on the best interests of the child. *N.C., supra* at 823–24. Bonding between the child and his or her biological parents and foster parents is a factor to be considered in determining the child's best interests. *In re C.M.*, 882 A.2d 507, 513–14 (Pa.Super.2005). Father argues that the trial court considered only the bond between the children and their foster parents, and did not hear evidence as to the bond between the children and Father. We disagree.

¶ 21 The record reveals that the trial court did indeed consider Father's bond with his children. A bonding assessment conducted in February 2005 concluded that there was a connection between Father and his children which had been established through weekly supervised visitation. (Trial Court Opinion, dated February 26, 2007, at 6 n. 8). It must be noted, however, that undisputed evidence from the November 29, 2006 hearing indicated that Father had not inquired about visitation with his children since his incarceration, which began in November 2005. (N.T., 11/29/06, at 18). Hence, the evidence indicates that the children's contact with Father had been very limited since they were a few months old, and in the

year prior to the hearing it had been non-existent.

¶ 22 An assessment of the bonds between the children and their foster parents was also carried out. This assessment revealed that the children had a strong attachment to their foster parents, and it expressed caution and concern about terminating contact with the foster parents. (Trial Court Opinion, dated February 26, 2007, at 6). At the time of the November 2006 hearing, the children had been in placement for almost 30 months, with the same foster family who wanted to adopt them. The children were only four months of age when they were placed, and thus their foster parents were in reality the only parents that they had known in their nearly three years of life.

¶ 23 After considering this evidence relevant to bonding, the trial court determined that the children's bond to their foster parents was of greater import than any bond that they might still have with Father. The evidence strongly supports the trial court's determination, and thus we will not disturb it.

 ¶ 24 In Father's fifth and final issue, he contends that the trial court erred in "not moving forward to place the children" with their paternal grandparents. (Father's Brief at 15). Father does not make clear what action would, in his view, constitute "moving forward" in this context, so we are able to discern neither the exact nature of his grievance, nor what relief he seeks.

¶ 25 However, in another section of his brief, Father contends that the trial court did not consider the paternal grandparents as a placement resource for the children. (*Id.* at 28). The record totally belies Father's contention. The paternal grandparents were considered as a resource when the children were first placed, but because of safety issues, the trial court declined to place the children with the grandparents. Specifically, the safety issues cited by the trial court centered on the paternal grandparents' inability or unwillingness to acknowledge that Father was capable of injuring the children. Because Father was not yet in prison, the trial court was not confident that the children would be safe in the grandparents' care. (*See* N.T., 11/29/06, at 60–61; Trial Court Opinion, dated February 26, 2007, at 6).[5]

¶ 26 The trial court readdressed the issue of placement with the grandparents at the November 29, 2006 hearing. Just before ordering the goal change to adoption, the court made the following statement:

> And here we are 30 months [after the original emergency placement]. These children have been in one home the entire time, have made extensive bonds with all members of the immediate [foster] family, the extended [foster] family, and the community. For us to uproot them and place them in the home of [grandparents] that they've had nothing

---

5. Undisputed testimony by the Agency caseworker established that the grandparents had been considered as a placement resource when the children were first placed; however, the Agency did not recommend placement with the grandparents because of their failure to recognize that Father could have been responsible for his children's injuries. (N.T., 11/29/06, at 20–21).

Grandmother testified at the placement hearings held on October 11, 2004; November 30, 2005; and November 29, 2006. At the two earlier hearings, she consistently testified as to her belief that the children were injured accidentally. (N.T., 10/11/04, at 18; 28–29; N.T., 11/30/05, at 55). At the November 29, 2006 hearing, she testified that she had presented herself as a resource for her granddaughters, that she would like visitation with her granddaughters, and that she did not have concerns about the children coming to live with her. (N.T., 11/29/06, at 48–52).

but casual contact with over their lives just does not make sense and is not in their best interests.

(N.T., 11/29/06, at 61). The court then ordered the children to remain in placement in their current foster home, changed their placement goal to adoption, but permitted visitation by Mother and the grandparents. (*Id.* at 61–62). We conclude that the trial court did not abuse its discretion either in the conduct of the proceedings or with its ultimate decision. Father simply does not agree with the trial court's choice of placement for the children; however, he cannot alter that decision by alleging—falsely—that the trial court failed to consider alternatives.[6]

¶ 27 In summary, after thorough review, we conclude that Father's issues lack merit, and accordingly we affirm the orders of the trial court.

¶ 28 Orders affirmed.

---

**6.** Likewise, Father's assertion is untrue that the trial court restated from the bench at the November 29, 2006 hearing its continuing concern that the grandparents posed a threat to the safety of the children. (*See* Father's Brief at 30). The trial court made no such statement during the hearing or in its February 26, 2007 opinion.