**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.A.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 516 WDA 2021 |

Appeal from the Order Entered March 26, 2021
In the Court of Common Pleas of Jefferson County Civil Division at No(s):
CP-33-DP-0000056-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.A.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 517 WDA 2021 |

Appeal from the Order Entered March 26, 2021
In the Court of Common Pleas of Jefferson County Civil Division at No(s):
CP-33-DP-0000057-2019

BEFORE:   OLSON, J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY OLSON, J.:                    **FILED: DECEMBER 1, 2021**

_____

[*] Retired Senior Judge assigned to the Superior Court.

Appellant, C.A.B. (Father), appeals from the order entered on March 26, 2021, changing the permanency goal for his two children[1] from reunification to adoption. Based upon our standard of review, we are constrained to affirm.

We briefly summarize the facts and procedural history of this case as follows. In August 2019, the children were living with their biological mother (Mother)[2] and her paramour in Jefferson County, Pennsylvania. On August 26, 2019, Jefferson County Children and Youth Services (the Agency) was granted emergency protective custody of the children after receiving reports that their basic needs were not being met, they were enduring physical abuse, and that Mother and her paramour were abusing controlled substances in the home. At the time the children were removed from Mother's home, Father was in intensive care at Armstrong County Hospital. The children were adjudicated dependent on August 28, 2019 and placed together in foster care. On October 2, 2019, the Agency initiated permanency and service plans for both children.

In December 2019, the trial court held a permanency review hearing. At that hearing, the trial court received a report from Dr. Allen H. Ryen, Ph.D., which included a bonding assessment of Father and the children from observations during supervised visitation. Following the review hearing, the trial court determined that Father was moderately compliant with the Agency's

---

[1] Z.B. (a female born March 2016) and Z.B. (a male born March 2018).

[2] Mother is not a party to this appeal.

- 2 -

permanency plan but ordered custody to remain with the Agency and placement to continue with the original foster family. The trial court held another permanency review hearing in June 2020. Again, it found Father moderately compliant with the permanency plan. On June 26, 2020, the Agency placed the children in kinship care with a paternal aunt and uncle. The trial court held another permanency review hearing in December 2020. On February 2, 2021, the trial court entered an order modifying the children's placement because the trial court determined that the kinship placement was not appropriate. As a result, the children were again placed with the original foster family. On March 4, 2021, the Agency filed a petition for a goal change from reunification to adoption. On March 24, 2021, the trial court held a permanency review hearing and entered orders changing the goal for both children from reunification to adoption. Father's timely appeal resulted.[3]

Appellant presents the following issues for our review:

A. Whether the [t]rial [c]ourt committed an abuse of discretion or error of law in finding that [Father] had only made minimal progress toward alleviating the circumstances which necessitated the original placement when at the previous [p]ermenancy [r]eview [h]earing he had made at least moderate progress including the most [recent] hearing held

_____

[3] Father filed a timely notice of appeal and corresponding concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). On May 12, 2021, this Court *sua sponte* consolidated the children's cases. On June 1, 2021, the trial court issued an opinion pursuant to Pa.R.A.P. 1925(a)(2)(ii). The Agency and court-appointed guardian *ad litem* for both children filed a joint appellate brief on August 19, 2021, requesting that this Court affirm the trial court order's changing the children's goal from reunification to adoption.

December 8, 2020 which was [two] months after his most recent hospitalization[?]  If this finding is based upon medical evidence only, [Father's] only change in circumstance was a 32 pound weight gain which cannot be the basis for this finding.

B. Whether the [t]rial [c]ourt committed an abuse of discretion or error law in finding that a goal change as to [Father] from "return to parent or guardian" to "adoption" was warranted based on the evidence presented by the Agency.  Specifically, the agency did not present any documented medical evidence that [Father] is unable to provide for the safety and well being of the children, that the children would not be safe in the care of their father, that his ongoing visitations with the children were anything but appropriate, and he, in any way, was the root cause of the failure of the kinship placement.

C. Whether the [t]rial [c]ourt committed an abuse of discretion or error of law in not considering the best interest of the child[ren] in making its determination.

D. Whether the [t]rial [c]ourt committed an abuse of discretion or error of law in failing to provide[] detailed [f]indings of [f]act to support [its] decision for [g]oal [c]hange and [p]rogress.

Father's Brief at 5-6.

Father argues the first two issues presented above in a single argument section in his appellate brief and, upon review, Father's third issue is also inter-related.  As such, we will examine Father's first three claims together.  Essentially, Father argues that "the [trial] court ignored the fact that [the children's d]ependency was based upon Father's hospitalization for an infection and now [decided] Father [] can no longer expect to reunify with, and see his children, because he is obese." *Id.* at 14.  Father argues that the trial court erred by relying upon only certain portions of Dr. Ryen's bonding assessment performed 17 months before the review hearing at issue.  *Id.* at 14.  More specifically, Father asserts that the trial court only relied upon a

portion of Dr. Ryen's report wherein he "noted that Father, though engaged with his children the entire time, was not the one initiating physical contact; rather, the children were going to him to interact on account of his compromised mobility." *Id.* Instead, Father points to other portions of Dr. Ryen's findings to show that he is bonded with the children including, *inter alia*, the children were excited to see Father during visitation and have a secure bond with him and Father was responsive, fully engaged, and easily able to redirect and quietly discipline them. *Id.* at 15. Dr. Ryen also opined that he did not have safety concerns for the children and believed unsupervised visitations with Father were imminent at the time of the assessment. *Id.* at 16. Father maintains that severing the "bond between [F]ather and children will have a devastating impact on the children and is not in their best interests." *Id.* at 23.

Regarding his health, Father concedes that he was admitted to the hospital for two weeks when the children were removed from Mother's home when his continuous positive airway pressure (CPAP) machine malfunctioned, and he was breathing carbon dioxide. *Id.* at 16. Father also "admitted that he was hospitalized a second time during the 18 months [when the children were dependent], in November of 2020, this time for pneumonia which [produced] blood clots in his legs." *Id.* at 17. Father further acknowledges that he suffers from hypertension, hypothyroidism, supraventricular tachycardia, gastroesophageal reflux disease, chronic obstructive pulmonary disease, asthma, and nocturnal respiratory issues. *Id.* at 17-18. However,

Father claims that the trial court erred by finding his health issues warranted the goal change because the testifying Agency caseworker admitted that Father's medical issues were controlled by current therapy and medication, and she did not provide Father's current medical records to the court. *Id.* Moreover, Father maintains "[t]here is nothing that Father has not completed [with regard to the children's permanency service plan], or [that he] failed to cooperate with the Agency in terms of tasks and services[.]" *Id.* at 19. Father also claims that, in assessing safety within his home, the trial court erred by overlooking evidence that Father's aunt currently resides there, as well. *Id.* at 20-21. In sum, Father claims that he "has not failed to perform his parental duties, nor has he relinquished them, [but his rights] are being taken away for [] only one reason: because the Agency, and the trial c]ourt, thinks he is too fat." *Id.* at 22.

We adhere to the following standards:

> When we review a trial court's order to change the placement goal for a dependent child to adoption, our standard is abuse of discretion.[4] In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias or ill will, as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of

_____

[4] Appellant cites the proper abuse of discretion standard of review in his scope and standard of review section of his appellate brief. *See* Appellant's Brief at 4. However, in the summary of the argument section of his brief, Appellant incorrectly asserts that a goal change is reviewed under the clear and convincing evidence standard. *Id.* at 11.

evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm even if the record could also support an opposite result.

Next, we note that in matters of placement for a dependent child, the trial court must be guided by the best interests of the child—not those of his or her parents.

Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act, [42 Pa.C.S.A. §§ 6301–6365,] which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA")[, 42 U.S.C. § 671 *et seq*]. The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. **Safety, permanency, and well-being of the child must take precedence over all other considerations, including the rights of the parents**.

At each review hearing for a dependent child who has been removed from the parental home, the court must consider the following, statutorily-mandated factors:

the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; [] a likely date by which the goal for the child might be achieved[; whether reasonable efforts were made to finalize the permanency plan in effect; and whether the child is safe]. 42 Pa.C.S.A. § 6351(f).

* * *

When the child welfare agency has made reasonable efforts to return a foster child to his or her biological parent, but those

> efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home. This Court has held that the placement process should be completed within 18 months.

> \* \* \*

> While this 18–month time frame may in some circumstances seem short, it is based on the policy that a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.K.*, 936 A.2d 528, 532–534 (Pa. Super. 2007) (case citation and original brackets omitted; internal footnotes incorporated; emphasis added).

"The official change in goal by the court is most commonly initiated by the agency." *In Interest of L.T.*, 158 A.3d 1266, 1278 (Pa. Super. 2017). However, "there is no statutory requirement that a juvenile court must provide express notice that it is contemplating a goal change." *Id.* "If reunification with the child's parent is not in a child's best interest, the court may determine that [a]doption is the appropriate permanency goal." *Interest of H.J.*, 206 A.3d 22, 25 (Pa. Super. 2019), *citing* 42 Pa.C.S.A. § 6351(f.1)(2). "A placement goal change to adoption does not terminate the parents' rights; however, it is a step in that direction." *Id.* (citation omitted). "By allowing the agency to change its goal to adoption, the trial court has decided that the agency has provided adequate services to the parent but that [the parent] is nonetheless incapable of caring for the child and that, therefore, adoption is now the favored disposition. In other words, the trial court order is the decision that allows the agency to give up on the parent." *In re N.C.*, 909

A.2d 818, 824 (Pa. Super. 2006) (citation and emphasis omitted). "[W]hile parental progress toward completion of a permanency plan is an important factor, it is not to be elevated to determinative status, to the exclusion of all other factors." *In re A.K.*, 936 A.2d at 534, *citing In re N.C.*, 909 A.2d at 824–827. "When circumstances are such that the best interests of the child dictate a goal change to adoption, then the trial court acts well within its authority to order the goal change—even if the parent has made substantial progress toward completion of his or her permanency plan." *Id.* When determining goal changes, the trial court should also consider input from an appointed guardian *ad litem*. *See In re N.C.*, 909 A.2d at 826.[5]

Upon review of the certified record, we note the following. At the March 2021 permanency review hearing, there was evidence that Father weighed over 400 pounds, and had gained 32 pounds after the initial Agency intervention. N.T., 3/24/2021, at 21, 30. Father acknowledged that his

_____

[5] Additionally, further independent research reveals at least one decision from the Court of Common Pleas addressing obesity and reunification. *See Ralston v. Ralston,* 55 A.3d 736, 740, n.2 (Pa. Super. 2012) ("Decisions of the Courts of Common Pleas are not binding precedent for the appellate courts, but may be considered for their persuasive value"). In the case of *In re D.K.*, 58 Pa. D. & C.4th 353 (CCP 2002), the Common Pleas Court of Northumberland County was called upon to determine whether a mother and her 16-year-old son, both described as morbidly obese, should be reunified. Ultimately, the court adjudicated the minor dependent on the basis that the mother's extreme obesity limited her ability to parent her son. The *D.K.* court ordered the mother to provide a safe, stable, and healthy environment for the minor child and for her to "address her own health concerns and well-being in order to care for D.K." *Id.* at 362.

weight was a concern for his overall health. *Id.* at 57-58. The Agency caseworker testified that she had concerns that Father could not walk upstairs quickly, that "his capabilities are certainly a part of [a] safety assessment, [and, as a result, she could not] say [the children] would be safe" in Father's home. *Id.* at 21-23. Father testified that it takes him "[a]bout three or four minutes" to walk upstairs in his residence. *Id.* at 73. Father, however, claims that he may have recently gained weight from his current thyroid medication and that his doctors are trying different prescriptions to alleviate the effects, but Father acknowledged that he has suffered from hypothyroidism and being overweight since he was sixteen years old. *Id.* at 15, 57. The Agency caseworker testified that Father's "health has deteriorated, and it still remains an issue." *Id.* at 24. She further testified that she's "had many conversations with [Father] about his medical issues that he faces." *Id.* at 27. Father's doctors have "discussed lifestyle modification for disease management and prevention" and recommended "a whole food diet rich in plant[-]based foods" and "exercising five days a week for thirty minutes" for Father. *Id.* at 68-69. Father claims that he has tried his best to follow doctor recommendations but admitted that since the inception of the case with the Agency, he has struggled with his own health issues. *Id.* At the time the children were removed from Mother's home in August 2019, Father was hospitalized for two weeks after his CPAP machine malfunctioned. *Id.* at 3, 53. Father was hospitalized again in November 2019 for pneumonia and blood clots in his legs. *Id.* at 53. In March 2020, Father had a same day surgical procedure at Armstrong Hospital

to remove an "IVC filter on [his] neck" that "help[ed] with the blood clots." *Id.* at 56. Father also admitted to using smokeless tobacco against his doctors' recommendations, but claims he is trying to quit and uses nicotine lozenges. *Id.* at 66.

At the conclusion of the review hearing, the trial court offered its reasoning for the goal change:

> For [Father], his house was never inappropriate from a physical standpoint. It was his health, and it still remains his health, and [] the evidence shows his health, which, this is the only case I can recall that I've had this as a goal change, his health leaves him in a position where today, I don't think he's able to care for the children medically, and I'm not – certainly no one in this room should have more sympathy than me for his condition.
>
> I can certainly say I get really annoyed at doctors telling me to lose weight, but I've heard it since I as five years old, and it's not happening.
>
> But I don't have a two year-old and a four year-old, and I'm not near as obese, although I am overly obese by charts, as [Father], and I think the testimony of the [Agency] caseworker is credible.
>
> We know he couldn't care for the children at the time of the initial placement, which was eighteen months ago.
>
> Although he may be in better personal medical health, I don't think he is in any better shape to take care of the children this day.

*Id.* at 79-80. The trial court, however, also noted that it would conduct "a review in six months." *Id.* at 81.

Here, there is no dispute that the children had been placed in the Agency's care for almost 19 months at the time of the review hearing. This Court has held that the placement process should be completed within 18

months, because the children's lives simply cannot be put on hold in the hope that Father will summon the ability to handle the responsibilities of parenting. *See In re A.K.*, 936 A.2d at 534. The safety, permanency, and well-being of the children takes precedence over all other considerations, including the rights of Father. *Id.* Ultimately, in this case, the trial court determined that the children were removed from their home, because Father was hospitalized and in intensive care at the time. The trial court found that Father had not remedied the conditions that had led to the children's removal. *See* Trial Court Opinion, 6/1/2021, at *1 ("Father, at the time they were removed from Mother's home, was not a placement option because he was in the ICU, and to date he suffers from a myriad [of] serious health problems exacerbated by obesity, the severity of which renders him incapable of properly caring for a 3- and 5-year-old."). The trial court determined that while "Father may love his children, the objective reality is that his weight and attendant health problems would in fact make it difficult, if not impossible[,] for him to adequately respond" to their safety needs. *Id.* at *2. More specifically, the trial court concluded that Dr. Ryen's assessment that Father's mobility was compromised and Father's testimony that it took him three to four minutes to walk upstairs in his residence was "plain evidence of Father's physical incapacity … in the event of an emergency." *Id.*, *citing* N.T., 3/24/2021, at 72-73. Further, the trial court determined that Father's aunt, who the trial court described as "elderly," was not a proper substitute resource if Father were unavailable. *See* Trial Court Opinion, 6/1/2021, at *2. Finally, the trial

court recognized that "the children are happy and thriving" in foster care, the foster parents were excited to have the children back in their care and expressed their desire to adopt, and, therefore, it was in their best interest to change the goal from reunification to adoption. *Id.*

Upon review, we agree with the trial court's assessment. Father admits that his overall health is a concern in caring for the children. While he contends that medication is to blame for his recent weight gain, Father admits that he has been overweight, and had associated medical conditions, since he was a teenager. Record evidence shows that the Agency addressed its concerns with Father about his medical conditions, but Father made no improvement and the children's safety remains a paramount concern. Accordingly, the trial court acted within the bounds of its discretion in concluding that Father's "weight and attendant health problems would prevent him from being an appropriate full-time caregiver" and Father "is not a viable permanency option." *See* Trial Court Opinion, 6/1/2021, at *2. Again, under well-settled Pennsylvania law, the trial court was not required to wait while Father summoned the ability to deal with his weight and related medical issues, in order to properly care for his children. As *D.K.* makes clear, it is not unreasonable for a court to base its goal change decision on a parent's inability to address his or her own health concerns related to obesity before reunification may occur. The record in this case demonstrates Father's increased absence from the home due to his ongoing health issues. Father has required hospitalized care on three separate occasions since the children's

removal from Mother's home. Obviously, during these absences, Father could not attend to the safety and well-being of his young children and there is no evidence of a reliable substitute parental resource in Father's home.[6] In addition, the trial court was justifiably concerned that Father's mobility created an unsafe environment in the event of an emergency. By his own admission, Father recognizes the limitations of his mobility. Thus, the trial court's rationale that Father is not a viable permanency option is not merely speculative and has support in the certified record.

Even though Father made progress with many aspects of the Agency's permanency plan, the trial court properly determined that the goal change to adoption was in the children's best interests. *See In re A.K.*, 936 A.2d at 534. The trial court found that the goal of adoption by the foster parents was in the best interest of the children, their well-being, and their need for permanence. The record supports that determination. Finally, the children's guardian *ad litem* agrees that the children's goal be changed from reunification to adoption. Based upon our standard of review, applicable law, and review of the certified record, we discern no abuse of discretion in changing the

---

[6] There is no record evidence that Father's aunt was a proper alternative resource. Upon review of the record, there is only evidence of the aunt's name, her age (68 years old at the time of the review hearing), and that she resided with Father. N.T., 3/24/2021, at 52. While Father complains that the "Agency offered no evidence that the aunt is a threat to the children and nothing more than a helping hand[,]" Father has not offered any evidence that his aunt was an appropriate, substitute caregiver. Father's Brief at 20-21. With such scant evidence regarding aunt, we may not disturb the trial court's findings and credibility determinations.

children's permanency goal from reunification to adoption. As such, Father's first three appellate issues lack merit.

Finally, in a three-sentence paragraph without any citation to legal authority, Appellant claims in his fourth issue on appeal that the trial court failed to provide detailed findings of fact to support its goal change decision. *See* Father's Brief at 24. Father has waived this issue. ***Umbelina v. Adams***, 34 A.3d 151, 161 (Pa Super. 2011), *citing* Pa.R.A.P. 2119(a) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."). However, we note that Pa.R.A.P. 1925(a)(2)(ii) governing children's fast track appeals provides, in pertinent part, that "[u]pon receipt of the notice of appeal and concise statement of errors complained of on appeal [] the trial judge who entered the order giving rise to the notice of appeal, if the reasons for the order do not already appear of record, shall [] file [] at least a brief opinion of the reasons for the order, [] but need not[] refer to the transcript of the proceedings." Pa.R.A.P. 1925(a)(2)(ii). Here, the trial court complied with Rule 1925(a)(2)(ii) by filing a brief opinion on June 1, 2021. Accordingly, Father's final claim is waived, but otherwise without merit.

Order affirmed.

- 15 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  12/1/2021