J.S43031/14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: T.W., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D.W., MOTHER | No. 792 EDA 2014 |

Appeal from the Order Entered February 4, 2014
In the Court of Common Pleas of Monroe County
Domestic Relations at No(s): CP-45-DP-0000064-2012
64 DP 2012, FID: 45-FN-41-2012

BEFORE: GANTMAN, P.J., ALLEN, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED AUGUST 22, 2014**

D.W. ("Mother") appeals from the order entered in the Monroe County Court of Common Pleas changing the permanency goal of her child, T.W. ("Child") from reunification with a concurrent goal of adoption to adoption with a concurrent goal of reunification. We affirm.

We adopt the facts and procedural history as set forth by the trial court. *See* Trial Ct. Op., 4/11/14, at 1-15. For ease of review, we summarize the following. Mother and Child's father, E.W. ("Father") were married in 2011. The trial court characterized the parents' relationship as

> marked by numerous claims of domestic violence by each parent, criminal charges flying back-and-forth, multiple filings under the Protection From Abuse ("PFA") Act, outright lies told by Mother about Father, instability, periods of separation, and significantly, a rare level of pathological co-dependence that has continually brought

---

[*] Former Justice specially assigned to the Superior Court.

> Mother and Father back together despite the volatility of their union. Acts of violence occur when Mother and Father are together and when they are separated.

*Id.* at 1-2 (citations to notes of testimony omitted). Child was born "very premature" in April of 2012 and has a heart condition which requires monitoring. *Id.* at 3.

Child came to the attention of Monroe County Children and Youth Services ("CYS") on June 30, 2012, when Mother reported that during a roadside argument, Father grabbed Child's car seat, with Child in it, from her "and threw it to the ground with tremendous force." *Id.* at 4.[1] CYS "ran Mother's criminal history [and discovered] she had a substantial arrest record, including a charge of cruelty to children" and an outstanding arrest warrant in Georgia for forgery charges. *Id.* at 6. On July 1, 2012, CYS was granted emergency protective custody of Child, and Child was placed in foster care. After a hearing on August 2nd, the court adjudicated Child dependent and set an initial permanency goal of reunification. *Id.* at 8.

The most recent review hearings were held on December 20, 2013 and January 24, 2014. On February 4, 2014, the court issued the underlying order changing the priority of the goals for Child, to a primary goal of adoption and secondary goal of reunification with Mother. Mother took this timely appeal and filed a contemporaneous statement of matters complained

---

[1] Father was arrested and charged with aggravated assault and related offenses for this incident. Trial Ct. Op. at 6.

of on appeal.[2]

Mother raises the following issues for our review:

1. Whether a dependence goal should be changed where:

    (A) The circumstances necessitating the original placement have been alleviated;

    (B) Mother has completed the requirements of the family service plan; and

    (C) [CYS] failed to make reasonable efforts to accomplish reunification?

Mother's Brief at 7. We address these together.

Mother contends the trial court abused its discretion in changing the goal from reunification to adoption. First, she argues that the trial court failed to give due consideration to her evidence that showed the circumstances necessitating Child's original placement were alleviated. *Id.* at 15. In support, Mother claims the following: (1) she recanted her statement that Child's injuries were caused by Father throwing Child from a vehicle; (2) the Georgia arrest warrant was no longer active and she was not in prison;[3] (3) the evidence showed Child's concussion and skull fractures

---

[2] *See* Pa.R.A.P. 1925(a)(2).

[3] Mother was arrested on the warrant, the same day that CYS gained emergency protective custody of Child, but authorities in Georgia declined to extradite Mother. Trial Ct. Op. at 6, 7. However, Mother was subsequently charged for the roadside incident in which Child's car seat was thrown. *Id.* at 8. Mother also later pleaded guilty to false reports to law enforcement and was sentenced to probation. *Id.* at 11.

were not caused by the roadside incident but instead occurred during her premature delivery.

Second, Mother maintains she completed her child permanency plan goals, including completing anger management and parenting courses, and undergoing psychological evaluations and domestic abuse counselling. Mother also contends the court diminished her "efforts because of the concurrent criminal case," inappropriately "dismissed her home . . . as a 'high crime and drug trafficking area' despite [CYS not] ever visiting the home," and "base[d] its decision on two incidents of domestic abuse." *Id.* at 19-20.

Finally, Mother alleges CYS failed to make reasonable efforts to accomplish reunification. She avers that CYS failed to conduct a home visit before it concluded her home was inappropriate for Child, and that her visits with Child were "[i]nexplicably" reduced at Father's request. *Id.* at 21. Mother further asserts the court erred in finding a seven-month lapse between review hearings, in violation of 42 Pa.C.S. § 6531(e)(3), did not prejudice her. She also claims CYS failed to identify or recruit a qualified family to adopt Child. *Id.* at 22.

We first note the relevant standard of review:

> When we review a trial court's order to change the placement goal for a dependent child to adoption, our standard is abuse of discretion. In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's

action was a result of partiality, prejudice, bias or ill will, as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm even if the record could also support an opposite result.

*In re A.K.*, 936 A.2d 528, 532-33 (Pa. Super. 2007) (citation omitted).

At each review hearing for a dependent child who has been removed from the parental home, the court must consider the following, statutorily-mandated factors:

the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved. [42 Pa.C.S.A. § 6351(f)].

\*   \*   \*

When the child welfare agency has made reasonable efforts to return a foster child to his or her biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home. This Court has held that the placement process should be completed within 18 months.

*Id.* at 533 (some citations omitted).

Additionally, Section 6351(f.1) of the Juvenile Act requires the trial court to make a determination regarding the child's placement goal:

> **(f.1) Additional determination.**—Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:
>
> \*     \*     \*
>
> (2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S. § 6351(f.1)(2).

On the issue of a placement goal change, this Court has stated:

> When a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. Moreover, although preserving the unity of the family is a purpose of the [Juvenile] Act, another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1.1). . . .

*In re K.C.*, 903 A.2d 12, 14-15 (Pa. Super. 2006) (some citations omitted).

This Court has explained, "[C]oncurrent planning is a dual-track system under which child welfare agencies provide services to parents to enable their reunification with their children, while also planning for alternative permanent placement should reunification fail." *In re Adoption of S.E.G.*, 901 A.2d 1017, 1019 (Pa. Super. 2006).

Instantly, after careful review of the record, including the notes of testimony of the December 20, 2013 and January 24, 2014 review hearings,

the parties' briefs, and the well-reasoned decision of the Honorable Jonathan Mark, we affirm on the basis of the trial court's decision. **See** Trial. Ct. Op., at 18-21, 28 (finding, *inter alia*: (1) underlying problem of roadside tug-of-war giving rise to Child's injuries was "well-documented, deep-seated history of violence between Mother and Father that . . . presents a danger to others, especially" Child; (2) Mother has "been unable to extricate herself from her relationship with Father" or "restrain her own violent and abusive tendencies" despite anger management and parenting classes and counseling from a clinician, minister, and pregnancy crisis group; (3) Mother's testimony that she and Father are no longer "together" was not credible; (4) Mother's home was not suitable for Child because it was located in a high crime, drug-trafficking area, and Mother's adult son, who lives there, now stands charged with felonies related to selling drugs in the home; (5) Mother has failed to support her claims of having a job and going to nursing school with formal documentation; and (6) Child had been in care for more than eighteen months). We discern no abuse of discretion by the trial court. **See In re A.K.**, 936 A.2d at 532-33. Accordingly, we affirm the trial court's order changing Child's permanency goal to adoption with a concurrent goal of reunification.

Order affirmed.

J. S43031/14

- 8 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/22/2014

In re T.W., a minor        :   NO. 64 DP 2012

                         :

                         :   FID 45-FN-41-2012

                         :

                         :   APPEAL DOCKET 792 EDA 2014

## OPINION IN SUPPORT OF ORDER PURSUANT TO Pa. R.A.P. 1925(a)

In this Children's Fast Track matter, D.W. ("Mother") has appealed the order entered on February 4, 2014, that continued T.W.'s dependency and changed the permanency goal from reunification, with a concurrent goal of adoption, to adoption, with a concurrent goal of reunification.[1] Mother complied with the Fast Track rules by filing her 1925(b) statement with her notice of appeal. We now issue this opinion pursuant to Pa. R.A.P. 1925(a).[2]

The relevant history, including the first contact that Monroe County Children and Youth Services (CYS) had with this family, predates T.W.'s birth.

Mother and T.W's father, E.W. ("Father"), were married in May of 2011. Their time together has, to put it mildly, been very turbulent. Their roller coaster relationship has been an on-again, off-again affair that is marked by numerous claims of domestic violence by each parent, criminal charges flying back-and-forth, multiple

---

[1] T.W.'s father did not file an appeal.

[2] Over the course of this case, four hearings have been transcribed. All four transcripts, with accompanying exhibits, are included in the certified record. For clarity and ease of reference, the transcripts will be cited as follows:

- The transcript of the July 2, 2012 Shelter Care Hearing will be cited as "N.T. 1, pp. ___"
- The transcript of the August 2, 2012 Adjudication Hearing will be cited as "N.T. 2, pp. ___"
- The transcript of the December 20, 2013 Review Hearing will be cited as "N.T. 3, pp. ___"
- The transcript of the second day of the review hearing, convened on January 24, 2014, will be cited as "N.T., 4 pp. ___"

1

filings under the Protection From Abuse ("PFA") Act, outright lies told by Mother about Father, instability, periods of separation, and, significantly, a rare level of pathological co-dependence that has continually brought Mother and Father back together despite the volatility of their union. Acts of violence occur when Mother and Father are together and when they are separated. (N.T. 2, pp. 9-14; N.T. 3, pp. 11, 14-18, 21-27, 52-56, 65-67, and Exhibits 2 through 4; N.T. 4, pp. 23-24, 30-31, 45-46, 84-88, 110-122, and GAL Exhibits 1 through 5).

Mother and Father both have children other than T.W. In fact, both have children from prior relationships that were also marked by domestic violence.

Including T.W., Mother has four children with four different fathers. Her relationships with the fathers of her three other children involved abuse, violence, and multiple PFA orders, some of which were issued against Mother. (N.T. 2, pp. 13-14; N.T. 3, pp.15-16 and Exhibit 4; N.T. 4, pp. 141-150). In part because of this history, Mother does not have custody of any of her minor children. Mother's oldest son, who is an adult, lives with Mother in Monroe County. However, her eight year-old son lives with his father in Georgia, a state that Mother cannot visit due to an outstanding arrest warrant. Mother has not seen her younger son in person since December of 2010. Similarly, Mother has a five year-old daughter who lives with her father in Florida. Mother last saw her daughter in April of 2011 when the police removed the child from Mother so that the child could be returned to her father. (N.T. 2, pp. 13-14; N.T. 4, pp. 146-150). Finally, as discussed below, T.W. has been in care in Monroe County since July 1, 2012.

2

Father has at least sixteen children with several different mothers. His children range in age from a son who is twenty-two down to T.W., who is now two years old. (N.T. 2, pp. 13-14; N.T. 3, p. 111; N.T. 4, pp. 122-127). Domestic problems in Father's past relationships started almost twenty-five years ago when the mother of his oldest child obtained a PFA against him. (N.T. 4, p. 127). The continuation of domestic problems led to the initial contact between CYS and Father.

In October of 2011, after Mother and Father were married but before T.W. was born, the mother of nine of Father's children filed in this Court a petition, on behalf of herself and all nine children, seeking a PFA against Father. CYS was ordered to assess the safety of the children. Following a hearing, the petition was granted and an eighteen-month PFA was issued against Father. The children and their mother were all named as protected persons. After the PFA was issued, the children and their mother moved to New Jersey. (N.T. 2, pp. 5-10; N.T. 4, pp. 122-127).

Subsequently, Mother became pregnant with T.W. Nonetheless, the domestic violence between Mother and Father continued. They tried some forms of counseling, but subsequent history has demonstrated that the counseling was not successful.

T.W. was born on April 3, 2012. She was very premature and had to stay in the hospital for a long time after birth. As a result, T.W. has a heart condition that needs to be monitored. Although both parents were aware of the condition, neither mentioned it to caseworkers when T.W. came into care. CYS later found out about the condition from one of T.W.'s doctors. (N.T. 2, pp. 9-15; N.T. 3, pp. 132-133).

T.W. first came to the attention of CYS on June 30, 2012. On that date, the agency received a referral that T.W. had been injured when Father threw her in her

3

car seat out of the family's van during a roadside argument with Mother. T.W. was initially taken to Pocono Medical Center, a local hospital, where she was diagnosed with a concussion and tests showed that she had hairline fractures. As a result, T.W. was transported to the pediatric trauma unit at Lehigh Valley Hospital, a regional medical facility located in Allentown, Pennsylvania. (N.T. 1, pp. 5, and 13-14; N.T. 2, pp. 9-18, Ex. 7, 8, and 9; N.T. 3, pp.39-48, Mother's Exhibits 1 and 2, and GAL Exhibit 1; Dependency Petition, filed July 9, 2012).

T.W. spent one night in Lehigh Valley Hospital. While T.W. had observable injuries, she was luckily not as seriously injured as originally thought. She was described as having a contusion on the left side of her head, a history of prematurity, and having suffered a fall, a head injury, and post concussive syndrome. She was released the next day. (N.T. 2, pp. 9-18, Exhibits 7, 8, and 9; N.T. 3, pp. 39-48, Mother's Exhibits 1 and 2, and GAL Exhibit 1).

CYS caseworkers interviewed Mother at Lehigh Valley Hospital about the incident. Regarding T.W.'s injuries, Mother told the caseworkers that the incident occurred while Father was driving her to a new job. During the trip, a bad argument erupted. Father became enraged, called Mother horrible names, hit and slapped her, and pulled her hair. At one point, Father pulled over. When Mother tried to take T.W. out of the car to keep her safe, a tug-of-war over the baby ensued. In a fit of rage, father grabbed the seat and threw it to the ground with tremendous force. Father started to leave, but then came back and broke Mother's cell phone. He then drove away, leaving Mother and T.W. at the side of the road (N.T. 2, pp. 9-20; Dependency Petition, filed July 9, 2012. *See* N.T. 3, pp. 39-48). The statement Mother gave the

4

caseworkers was consistent with the statements she gave to the Pennsylvania State Police and medical personnel. (N.T. 3, pp. 100-102). In all initial statements, Mother unequivocally stated that Father threw T.W. in her car seat out of the vehicle.

The caseworkers also obtained from Mother a history of her relationship with Father. Mother told the caseworkers that Father is verbally and physically abusive, very controlling, and vulgar. She stated that Father had assaulted her on several occasions and showed the caseworkers scars and burns up and down her arms that she said were inflicted by Father. The caseworkers took photos of the burns and scarring that were later admitted into evidence during the adjudication hearing. Mother also told the caseworkers that Father had raped her and had "put out a hit on" the woman who was the mother of nine of his children and who had obtained PFA against him. (N.T. 2, pp. 9-20; Dependency Petition, filed July 9, 2012. *See* N.T. 3, pp. 39-48).

Based on Mother's statements and T.W.'s injuries, the caseworkers developed a safety contract. The plan included Mother filing for a PFA against Father, having no contact with Father, and taking T.W. to a shelter where Mother had previously sought refuge from Father. Mother agreed to the contract. (N.T. 2, pp. 18-19).

The caseworkers explained to Mother that, given the circumstances, CYS would be opening a case, investigating the matter, and providing necessary services. Mother was told the investigation would include running criminal history checks. Mother was then asked whether she had any criminal history. Mother denied having any history. (N.T. 2, p. 20).

5

As a result of the incident, Father was charged with Aggravated Assault and related charges. He was incarcerated in the Monroe County Correctional Facility in lieu of bail.

CYS caseworkers ran Mother's criminal history. They discovered that Mother had not been honest with them, in that she had a substantial arrest record, including a charge of cruelty to children, although dispositions for some of the arrests were not reported. Significantly, the history also revealed that there was an outstanding warrant out of Georgia for Mother's arrest on forgery charges which was lodged with the notation that Georgia would extradite. (N.T. 1, pp. 2, 5, and 10; N.T. 2, pp. 20-25; N.T. 3, pp. 46-48). Later, CYS learned that Mother had used several names and aliases in several states and that she had or may have additional criminal history in other states. (N.T. 1, p. 7; N.T. 2, pp. 20-24).

Mother was arrested on the warrant on July 1, 2012. That same day, CYS sought and was granted emergency protective custody of T.W. since both of her parents were incarcerated and no suitable relatives were immediately available. T.W. has been in care ever since.

Over the next few weeks, several hearings were held. In addition, Mother's story and position began to change. In broad summary:

A shelter care hearing was held on July 2, 2012. The hearing was convened quickly in order to give Mother the opportunity to place her position on the record and advise the Court, CYS, and the guardian *ad litem* of possible family or other placement resources for T.W. before she faced extradition to Georgia. In fact, Mother was allowed to participate in the hearing by telephone from jail so that she

6

could assert her position. (N.T. 1, pp. 2-8 and 15-19). Mother provided the names of several family members, including her 21 year-old son with whom she lived, as family resources. (*Id.* at 10-13). Surprisingly, Mother then began the process of recanting her story and accusations against Father. She said that the charges (which were based on statements she made to authorities) were false and inaccurate, that she would not testify against Father, that she did not believe that father had injured T.W., that the doctors at Lehigh Valley indicated that Pocono Medical Center had misdiagnosed T.W., and that T.W. did not have any injuries. (*Id.* at 8-11, 13, and 15). Mother also stated that, if she was extradited to Georgia and Father was released from prison, she wanted T.W. to be with Father. (*Id.* at 13 and 15).

Around the same time, a separate extradition hearing was held. In advance of the hearing, the Commonwealth filed a motion to detain Mother here as a material witness in the case against Father. At hearing, the Assistant District Attorney assigned to the case represented that he had personally communicated with officials from Georgia who, despite the extradition notation in the data base, declined to extradite Mother. Thus, both extradition and the Commonwealth's motion became moot.

At one point while both parents were in jail, Mother attempted to use deception to arrange an in-jail meeting with Father. Specifically, she falsely told officials at the jail that the undersigned had given her permission to meet with Father in the correctional facility to discuss their cases and T.W. Of course, no such permission had been given. The in-jail meeting was foiled when the correctional facility called

7

CYS and was told that the Court had not given any such permission. (N.T. 2, pp. 61-63).

Prior to the adjudication hearing, Father gave his first version of what had happened on June 30, 2012. He indicated that it was Mother who violently pulled T.W. in her car seat from the car. (N.T. 2, pp. 44-47, and 53).

In addition, Mother was arrested and criminally charged for the incident and injuries sustained by T.W. As a result, as of the time of the adjudication hearing, both parents stood charged with committing crimes against T.W.

An adjudication hearing was held on August 2, 2012.[3] At the hearing, several witnesses testified and medical records from Pocono Medical Center and Lehigh Valley Hospital were admitted into evidence. It was established that T.W. had been injured, but not as seriously as originally thought. (N.T. 2, pp. 18-20, 28-30, and Exhibits 3, 7, 8, and 9). At the conclusion of the hearing, T.W. was adjudicated dependent and her placement in foster care was continued. The initial permanency goal was reunification. Neither parent appealed the dependency adjudication.

Based on her age, T.W. qualified for this Court's three-month review protocol. Accordingly, three-month permanency and placement review hearings were held before the dependency Master throughout the remainder of 2012 and into 2013. The last hearing before the Master was held in May of 2013. Throughout the proceedings before the Master, the permanency goal approved by this Court was reunification, with a concurrent goal of adoption. (See Orders dated October 25, 2012, January 10,

---

[3] The adjudication hearing was initially scheduled for mid-July 2012, but was continued and then rescheduled to August 2, 2012, because of the subsequent charges that were filed against Mother, the preliminary and other hearings that were being held in the criminal cases, and a series of unfortunate conflicts that arose regarding attorney representation for the parents. These intervening events account for the delay between the shelter care hearing and the adjudication hearing.

8

2013, and May 10, 2013). No party objected to any of the Master's recommendations.

This case was scheduled for another review hearing before the Master in September of 2013. At the hearing, the parties appeared. CYS objected to the jurisdiction of the Master. Even though no hearing was held that day, the appearance was significant in that Mother showed up with injuries that she said were inflicted by Father in an incident for which Father was criminally charged. The charges were later dropped because Mother refused to cooperate. (N.T. 3, pp. 21-22).

As a result of the objection lodged by CYS, a hearing before the Court was scheduled in October 2013. However, the guardian *ad litem* asked for a continuance so that she could obtain records regarding Mother from both Florida and Georgia. The continuance was granted.

A review hearing was convened before the Court. Evidence was taken on December 20, 2013, and January 24, 2014. At the conclusion of the review hearing, the Court issued the goal change order from which Mother has filed this appeal.[4]

The two-day review hearing generated a substantial amount of evidence. Due, in part, to changes in counsel for both parents over the course of this case, a significant portion of the two-day hearing repeated evidence, much of which is summarized above, that was introduced in prior proceedings. In addition, new

---

[4] On December 3, 2013, CYS filed a petition for termination of the parental rights of both parents. We recognize that, in an appropriate case, it is a "best practice" to hold goal change and termination of parental rights hearings simultaneously. In this case, we did not adopt this procedure because the petition for a review hearing was filed and the review hearing was originally scheduled within the relevant fifteen month period, the rescheduling before the court and attendant continuance were requested by CYS and the guardian *ad litem*, not parents, the termination petition was not filed until after the review hearing had been scheduled, and, significantly, review orders and record facts demonstrated that parents had made moderate progress. In the order that Mother is challenging in this appeal, we scheduled a hearing on the termination petition. However, at the request of the parties, that hearing has been continued until this appeal is decided.

evidence was presented, and matters that had been previously recited were expanded upon and clarified.

At the review hearing, Father provided his version of what happened on June 30, 2012. The first portion of Father's story is consistent with the statements Mother made at the time. Like Mother, Father indicated that the incident occurred when a very bad argument erupted while Father was driving Mother to work and a tug-of-war over T.W.'s car seat occurred after Father had pulled over to the side of the road. In all other respects, the parents' respective versions of events were diametrically opposed. (N.T. 4, pp. 91-101).

Father denied that he hit or verbally or physically abused Mother. In addition, Father stated that Mother was the instigator. He adamantly denied throwing T.W. in car seat from the vehicle. Instead, he testified that he tried to block Mother from removing T.W. from the van, but that Mother, in the tug-of-war, was violently pulling at the car seat and ultimately violently pulled the seat out of the van. Thereafter, Mother held the car seat behind her while threating various types of action against Father. This version of events is consistent with what Father had previously told CYS workers. (N.T. 2, pp. 42-43, and 46-48; N.T. 3, pp. 3 and 48; N.T. 4, pp. 91-101).

Father's rendition of what happened during the June 30, 2012 incident was not the only evidence presented during the review hearing of Mother's inappropriate physical handling of T.W. and was not the only explanation for T.W.'s injuries that he advanced. Additionally, Father showed a CYS supervisor text messages in which Mother informed Father that she had dropped T.W. two days before the June 30, 2012 incident and admitted to making up the allegations against Father. (N.T. 3, pp.

10

59-62; N.T. 4, pp. 42-49). CYS found the timing of Father's disclosure to be problematic, because the disclosure was made months after T.W. was adjudicated dependent and long after the dropping incident should have been reported to medical personnel. (N.T. 3, pp. 59-62; N.T. 4, pp. 25-26, 37, 42, and 49).

Along similar lines, Father's two versions about how T.W. was or could have been injured was inconsistent with both parents' early contention, which Mother resurrected during the review hearing, that T.W. had not been injured. (N.T. 3, pp. 59-62).

Between the time T.W. came into care and commencement of the December 2013 review hearing, significant events transpired in the parents' criminal cases. First, Mother fully and formally recanted her story. She said that Father did not throw T.W. out of the van. As a result, and because the injuries to T.W. were more ambiguous than initially thought, the Commonwealth ultimately withdrew the charges against Father. Mother, in turn, pled guilty to an amended charge of false reports to law enforcement based on her lying to the police about Father. She was placed on probation. (N.T. 3, pp. 39-48 and 95-104).

Evidence presented during the review hearing demonstrated that Mother and Father's continuing course of abusive and violent conduct against each other, of which the June 30, 2012 indent was a part, has not abated. Specifically, even after Mother and Father were told they needed to stop the pattern of abuse and violence before T.W. could safely be returned to either or both of them, there were additional incidents in which one parent assaulted or allegedly assaulted the other. In several of the incidents, police responded and the parent who committed the assault was

11

charged. In one incident, caught on videotape, Father assaulted Mother outside a community library. In another incident, Mother cut Father with a knife. In still another, mentioned above, Father assaulted Mother, who soon thereafter appeared for a Master's hearing with a split lip.

The evidence also demonstrated that the parallel pattern of neither parent following through on charges also continued: in each case in which an arrest was made, charges were dropped because the victim spouse declined to cooperate or appear for hearings. Similarly, the pattern of Mother and Father getting back together after bouts of violence continued. After each incident, the parties reconciled, although most recently they have played their reconciliation close to the vest. (N.T. 3, pp. 11, 14-18, 58-62, and 65-75; N.T. 4, pp. 23-31 and 45-46).

PFA filings also continued. Father filed multiple PFA petitions against Mother, the first three or four of which were dismissed because Father failed to appear. In a final round of PFA filings, Father filed against Mother, Father's adult daughter, who had purportedly come to live with him, also filed against Mother, and Mother filed a against Father. All three petitions were dismissed after a hearing. (N.T., 3 pp. 14-18, 58-62, and Exhibit 4; N.T. 4, pp. 23-31, 110-122, and GAL Exhibits 1-5).

At the review hearing, Mother testified that she and Father are, finally, estranged. She stated that they have not been together since September of 2013 when Father gave her the split lip. (N.T. 4, pp. 139-140). However, based on the history of this case, Mother's past deceptions, the evidence presented by CYS, the conduct of both parents, and our in-court observations of Mother and Father, we did not find Mother's statement credible. In this regard, as indicated, the violence and

12

domestic abuse has continued. The incident in which Mother cut Father with a knife occurred at Father's residence. Despite the fact that the parties were supposedly living apart and Father had asked for separate visits so he and Mother would not come into contact with each other, Father has been seen driving Mother to and dropping her off for visits and criminal hearings. Most recently, when CYS personnel have attempted to ask about the current status of the parents' relationship, Father has told them that it is none of the agency's business. (N.T. 3, pp. 11, 56-59, and 65-75: N.T. 4, pp. 23-31, 71, and 84-88, 110-122).

While both parents demonstrated an inability to cease their violent and co-dependent behaviors, each has made some progress. Specifically, both parents completed their plan goals for counseling, parenting classes, anger management classes, and related goals. In fact, Mother has exceeded the counseling and education requirements, albeit with some prompting based on her criminal case and probationary sentence. (N.T. 3, pp. 12, 49, and 52; N.T. 4, pp. 48 and 135-139). At the same time, the evidence demonstrated that counseling and classes have not been enough to help Mother either fix her unhealthy relationship with Father or separate from him, and have similarly been insufficient to prompt Mother to stop her own violent and abusive behaviors.

In addition, Mother has indicated that she is continuing her education, seeking to become a nurse, and that she now works at JC Penny, both of which, if Mother is following through, are positive. However, Mother has not responded to the requests of CYS for documentation of her employment. (N.T. 3, pp. 11-12; N.T. 4, p. 140).

13

Further, both parents have visited on a regular or fairly regular basis, Mother more so than Father. In fact, at one point, based on their completion of several plan goals, Mother and Father progressed to having community visits. However, as noted, there have some problems that resulted in Father asking for the visits to be returned to the Agency. In addition, Father protested the participation of Mother's family in visits, especially community visits. Further, the continued violence between the parents, despite their completion of counseling and therapy, raised legitimate safety concerns. As a result, visits were moved back to the CYS facility. (N.T. 3, pp. 12-15, 34-35, 49, and 52-60; N.T. 4, pp. 23-31, 48, 135, and 141-143).

Mother is currently living with her mother and her adult son in a three-bedroom home in Stroudsburg. If she regains custody of T.W., Mother's plan would be to bring T.W. into the home. However, the home is in a high crime and drug trafficking area. In fact, Mother's adult son, whom she had at the outset of this case identified as a resource for T.W., was arrested for possession of drugs with the intent to deliver after selling drugs to a confidential informant in the home. (N.T. 3, pp. 11-12; N.T. 4, pp. 72-75, 132-133, 140, and 146-147).

Finally, consistent with their inconsistent, dysfunctional, co-dependent relationship, each party, in his or her own way, advised the Court that they do not believe that T.W. would be safe with the other parent. They did so despite the fact that the circumstances that prompted each parent's safety concerns were known to Mother and Father at the time of their past reconciliations and regardless of the fact that they are now together again.

14

The totality of these facts and circumstances prompted us to issue the order from which Mother has filed this appeal.

The applicable standard of review is well-established. As recently reiterated by our Supreme Court:

> [A]ppellate courts must apply an abuse of discretion standard.... [I]n dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa.2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.;* [ *In re* ] *R.I.S.*, [614 Pa. 275] 36 A.3d [567,] 572 [(Pa.2011) (plurality) ]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.; see also Samuel–Bassett v. Kia Motors America, Inc.* [613 Pa. 371], 34 A.3d 1, 51 ( [Pa.]2011); *Christianson v. Ely*, 575 Pa. 647, 838 A.2d 630, 634 (2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of

15

discretion. *In re Adoption of Atencio,* 539 Pa. 161, 165, 650 A.2d 1064, 1066 (Pa.1994).

*In re Adoption of S.P.,* 47 A.3d 817, 826–827 (2012). *See also In re R.J.T.,* 9 A.3d 1179 (Pa. 2010); *In re K.J.,* 27 A.3d 236 (Pa. Super. 2011); *In re M.B.,* 19 A.3d 1084 (Pa. Super. 2011).

The law that we applied in making factual findings and issuing the goal change order from which Mother has appealed is equally well-settled. Once dependency is found, the standard to be applied is the best interests of the child. This standard applies to, among other considerations, disposition, placement, and custody of dependent children, and the establishment of goals and goal changes for families. On these issues, determinations turn on what is in the child's best interests, not on what the parent wants or which goals the parent has achieved. *See R.J.T., supra; In re K.J., supra; In re K.C.,* 903 A.2d 12 (Pa. Super. 2006); *In re B.S.,* 861 A.2d 974 (Pa. Super. 2004). Thus, in a goal change proceeding, a parent's progress toward alleviating the circumstances that caused placement is but one factor that must be considered. *In re B.S., supra.* In fact, when the best interests of the child so dictate, dependency and placement outside the home may be continued, even if the parent has met all goals established in the Family Service plan. *See In re K.C., supra.*

Additionally, as our Superior Court recently stated:

> Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act [42 Pa.C.S. §§ 6301–65], which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"). The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and

16

> long-term parental commitment. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over *all* other considerations, including the rights of the parents.
>
> *In re N.C.*, 909 A.2d 818, 823 (Pa.Super.2006) (citations omitted) (footnotes omitted).
>
> Pursuant to § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. *In re R.J.T.*, 9 A.3d at 1186–1187 n. 8 (" *In re R.J.T. II* "). The best interests of the child, and not the interests of the parent, must guide the trial court. *In re S.B.*, 208 Pa.Super. 21, 943 A.2d 973, 978 (2008). As this Court has held, "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re N.C.*, 909 A.2d at 824 (quoting *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa.Super.2003)).

*In re M.B.*, 19 A.3d at 1088-89.

In setting or changing goals and making statutorily required findings, juvenile courts are not required to select only one goal at a time. Rather, as we have done throughout the course of this case, courts may establish concurrent goals and direct that child welfare agencies engage in concurrent planning, which in its most frequently used form, "involves a dual-track system by which agencies are

17

encouraged to provide simultaneous services aimed at both reunification and adoption." *In re S.E.G.*, 901 A.2d 1017, 1019 (Pa. 2006). *See also R.J.T., supra.* Indeed, concurrent planning has been identified as a "best practice." *R.J.T.*, *9 A. 3d at 1191 n. 14.* This is "because it both protects the child from foster care drift, by allowing agencies to consider adoptive resources ... while at the same time keeping alive the potential for reunification." *In re S.E.G.*, 901 A.2d at 1029. *See also R.J.T.*

Prompted by Mother's appeal, we have again reviewed this case in light of the law summarized above. We remain firmly convinced that we neither erred nor abused our discretion in issuing the goal change order. More importantly, we believe the goal change order is consistent with the best interests of T.W.

In her appeal statement, Mother lists seven assignments of error which, for the most part, are subsumed in her first assignment in which she contends that "[t]he trial court erred inasmuch as the evidence presented at the Permanency Review Hearing was insufficient to support changing the goal to adoption instead of reunification". (Mother's 1925(b) Statement, Paragraph 2). The remaining assignments of error take issue with specified findings and determinations. Mother claims that the identified findings were individually erroneous and cumulatively led us to improperly change the permanency goal. There is no merit to any aspect of Mother's arguments.

The reasons why we changed the goal to adoption, with a concurrent goal of reunification, are presaged by and captured in our recitation of the facts of this case. In a nutshell, T.W., while still a premature and fragile infant, was dropped, injured, and, by both parents' account of the June 30, 2012 incident, the subject of a roadside tug-of-war between Mother and Father. The underlying problem that caused T.W. to

18

be put in peril and injured is the well-documented, deep-seated history of violence between Mother and Father that is embedded in their relationship and presents a danger to others, especially T.W. Despite anger management classes, parenting classes, services from CYS, counseling received from a clinician, a minister, and a pregnancy crisis group of her own choosing, as well as involvement in the criminal justice system and PFA court, Mother has to date been unable to extricate herself from her relationship with Father, protect herself from Father, restrain her own violent and abusive tendencies, stop the alternating pattern of being a victim and then a perpetrator of abuse, or stop her pathological lying. In fact, based on the evidence, Mother and Father's history, and the courtroom demeanor of both parents, we firmly believe that the parties are together and not, as Mother testified, estranged. Simply put, Mother has not demonstrated necessary protective capacities and the reasons that caused T.W. to come into care have not, despite Mothers protestations to the contrary, been alleviated. Unless Mother makes drastic changes very soon, the reasons will not be alleviated.

In addition, Mother articulated a home plan that would have T.W. living in a home, located in a high crime drug-trafficking area, out of which her maternal uncle was caught selling drugs and now stands charged with felony drug crimes. Obviously, that plan is not suitable.

Further, while Mother's satisfaction of many plan goals is a positive, she has not been able to put what she has learned into action in order to make the necessary changes to properly parent T.W. and ensure her child's safety. Along similar lines, Mother has indicated that she has a job and is going to school. However, she has

19

not yet provided formal proof or documentation of her employment or the specifics of the nursing program in which she has indicated she is enrolled.

Finally, as of the original date scheduled for the review hearing before the Master, T.W. had been in care approximately fourteen months. She has now been in care for more than the 18 months in which our appellate courts have indicated that, under current law, permanency should be achieved. *See In re R.J.S.*, 901 A.2d 502 (Pa. Super. 2006); *In re N.W.*, 859 A.2d 501 (Pa. Super. 2004). *See also In re K.M.*, 53 A.3d 781 (Pa. Super. 2012). During this time period, Mother was not able to learn from her mistakes, capitalize on the counseling and services which she had received, demonstrate the necessary protective capacities, alleviate the reasons for T.W.'s removal from the home, or show that she has the ability to parent T.W. in a manner consistent with T.W.'s best interests.

Under the settled law summarized above, the applicable standard is the best interests of the child. Under equally well-established law, T.W.'s safety, permanency, and wellbeing are paramount, and these considerations trump either parents' needs, desires, and beliefs. Based on our longitudinal view of the evidence, our in-court observations of Mother on and off the witness stand, Mother's overall parenting history, the facts presented by CYS, the well-reasoned and articulated positions of CYS and T.W.'s guardian *ad litem*, and the applicable law, it was and still is obvious to us that Mother has simply not progressed to the point where T.W. could safely be returned to her. That determination, coupled with T.W.'s needs and welfare, the amount of time T.W. has been in care, and the firmly entrenched and oft-quoted doctrine that "a child's life simply cannot be put on hold in the hope that the parent

20

will summon the ability to handle the responsibilities of parenting," *In re M.B.,* 19 A.3d at 1088-89 (citations omitted), led us inexorably to the conclusion that the goal change we ordered was in T.W.'s best interests.

At the same time, the goal change with which Mother takes issue has not, as she apparently fears, completely cut off all hope or the possibility of reunification. Nothing in our order precludes Mother from redoubling her efforts or prevents either the provision of reunification services or the possibility of reunification itself. In fact, the order includes a concurrent goal of reunification. We included that concurrent goal because some progress had been made in that both parents had satisfied the plan goals mentioned above. As a result, and considering all facts and circumstances, while termination and adoption planning must now take lead position in this case, we did not at the time believe it necessary to completely cut off all possibility of reunification. If Mother is truly sincere about her desire to turn things around, be truthful, and work toward demonstrating that she can provide for the health, safety, welfare, needs, and best interests of T.W., she still has the ability to do so.

Mother's individual assignments of error may be discussed and disposed of quickly. Mother's first contention is that this Court did not give proper weight to the fact that she had "completed a Child Permanency Plan and would be capable of completing any additional plan for the return of the minor child." (Mother's 1925(b) Statement, Paragraph 3). This assertion is not supported by the record.

We did, in fact, give credit and proper weight to the fact that Mother had completed, and in some instances exceeded, the plan goals mentioned above.

21

Indeed, it is for this reason that we made a finding in the order Mother has appealed, as well as in prior review orders, that Mother has made moderate progress. At the same time, viewing all facts and circumstances in light of the best interest standard, the progress made by Mother was not enough. T.W.'s safety and Mother removing herself and T.W. from the vortex of violence that marks Mother's relationship with Father have throughout this case been overarching goals and considerations. Despite receiving many services, Mother has simply not met this goal. Since Mother has not developed or demonstrated necessary protective capacities to keep T.W. safe, because the Court has found that Mother and father have not been forthcoming about the current status of their relationship, and given the fact that Mother does not have a suitable home plan, it is clearly not in T.W's best interests at this point in the proceeding to work toward reunification as a primary goal. Again, in a goal change proceeding, a parent's progress toward alleviating the circumstances that caused placement is but one factor that must be considered. *In re B.S., supra.* In fact, when the best interests of the child so dictate, dependency and placement outside the home may be continued, even if the parent has met all goals established in the Family Service plan. *See In re K.C., supra.*

Mother's second assignment of error is that we failed to give proper weight "to the medical testimony alleviating the circumstances which necessitated the original placement; testimony from the treating physician indicated that the occipital hairline fracture which necessitated the original placement was indicative of premature delivery and eliminated physical abuse or blunt force trauma." (Mother's 1925(b) Statement, Paragraph 4). Simply, we did not so err.

22

Throughout this case, we have considered the medical testimony that has been presented. That evidence is summarized above. Our finding, based on that evidence, is that T.W. was, in fact, injured, although the injuries were luckily not as serious as first believed when a diagnostic test performed at Pocono Medical Center revealed the hairline fractures. Mother's disagreement with our finding does not allege, much less demonstrate, an error of law or an abuse of discretion. This is especially true since our finding is supported by both the documentary medical evidence that was submitted at the adjudication hearing and the most recent review hearing[5] and the testimonial evidence that parents elicited from the Lehigh Valley Hospital physician whom Father called as a witness.

In this regard, the Lehigh Valley Hospital physician expressed his opinion that the hairline fractures first seen at Pocono Medical Center were older injuries, not acute injuries. However, he did not render an opinion, to a reasonable degree of medical certainty or otherwise, that "eliminated physical abuse or blunt force trauma." Rather, the doctor opined that the hairline fractures resulted from a previous trauma, which another doctor speculated might have been a birth-related trauma, although neither doctor knew anything about the birth itself or whether T.W. was delivered normally or by C-Section. Similarly, no medical professional at the time had a history that included Father's version of events that transpired on June 30, 2012 or the fact that Mother had dropped T.W. two days before. When the doctor's testimony is viewed objectively, in full, and in conjunction with the medical records, it is clear that

---

[5] Counsel for Father, and to some extent the attorney for Mother, spent a substantial amount of time at the review hearing asserting that the records from Lehigh Valley Hospital had not been previously admitted into evidence, and asserting, or at least implying, that the records had been withheld by CYS, the Commonwealth, or both. However, the record is clear that medical records from both Pocono Medical Center and Lehigh Valley hospital were admitted during the adjudication hearing. (N.T. 2, pp. 2 and 31 and Exhibits 7, 8, and 9).

23

T.W. in fact had hairline fractures that resulted from some sort of trauma, but were not, in the doctor's opinion, acute injuries. In addition, the doctor acknowledged that there were objective signs of injury in the nature of a contusion on the left side of T.W.'s head. Further, he ultimately did not dispute Pocono Medical Center's diagnosis of a concussion. In fact, Lehigh Valley Hospital discharged T.W. with a diagnosis of head injury and indicated that she had suffered a fall, a head injury, and post-concussive syndrome. (N.T. 3, pp. 77-83, Mother's Exhibits 1 and 2, and GAL Exhibit 1).

Moreover, this argument is nothing but a reiteration of the assertion Mother has made at various points in this case that T.W. did not sustain *any* injuries. Even if that interpretation is accepted as true, it misses the point of the case – and the objective facts. T.W.'s injuries brought T.W. to the attention of CYS and ultimately to this Court. Mother and Father's incarceration, coupled with Mother's past, caused T.W. to come into care. Since then, it has been the need to keep T.W. safe and parents' inability to ensure that need, not the fact that she was previously injured, that has kept her in care. T.W.'s injuries have healed and the holes in her heart that both parents failed to mention have mended. However, concern for T.W.' safety and over Mother's lack of protective capacities remain.

Due to Mother's admitted lying about the June 30, 2012 incident, her history of deception, the fact that Mother and Father are both playing their cards close to the vest, and the discrepancies between the statements of both parents and their conduct, we may never know exactly what occurred on June 30, 2012, or precisely what happened to T.W. when Mother dropped her several days before. What we do

24

know is that on June 30, 2012, and on at least one prior occasion, T.W. was placed in harm's way by one or both parents because of the volatile nature of their relationship. Since her parents are still acting abusively towards each other, the circumstances which caused T.W. to be put in peril continue to exist. Similarly, neither parent has to date been able to demonstrate acceptable protective capacities. Simply, T.W.'s safety is not ensured. Thus, it is at present largely irrelevant how the medical evidence in this case is interpreted or how T.W's 2012 injuries are characterized.

T.W.'s health, safety, and well-being are the paramount concerns, and her best interest is the guide star. T.W.'s safety must be ensured regardless of whether she was injured in the roadside incident, which scenario could be supported by at least Father's testimony; in the incident where Mother dropped her, which scenario could be supported by the statements of both parents; or in some prior incident which has yet to be explained by parents, but that would be equally problematic. In fact, T.W.'s safety must be assured even if Mother's no-injury assertion is accepted. Neither parent has demonstrated the current ability to provide the requisite assurance. In this regard, it cannot be emphasized enough that, under both parents' versions of the June 30, 2012 incident, T.W. came into care because the volatile nature of Mother and Father's relationship shockingly caused them to became embroiled in an argument that led them to literally play a game of tug-of-war with T.W., in her car seat, at the side of a public road. While T.W. is now physically safe, the tug-of-war between the parents continues, at times literally and at times

figuratively, and the underlying issues that cause their battles have not been resolved.

Assignments of error four through six take issue with specific findings we made regarding the reasonableness of efforts made by CYS to finalize T.W's permanency plan. (Mother's 1925(b) Statement, Paragraphs 5, 6, and 7). All three assignments are bootless.

Mother first implies that efforts were unreasonable because "more than three months expired without a review of the permanency plan." However, three month reviews are not mandatory. The Juvenile Act and the applicable rules of Juvenile Court Procedure require that courts conduct permanency and placement reviews at least every six months. *See* 42 Pa.C.S.A. § 6351(e)(3) and Pa. R.J.C.P. 1607B. While three month reviews are a best practice that this Court has generally adopted for a targeted number of dependency proceedings pursuant to a local protocol, there is simply no legal requirement to conduct ninety day reviews.

We recognize that almost seven months elapsed between the most recent review before the Master and the review hearing that was convened by this Court in December of 2013. However, the extra month was not caused by any improper or unreasonable act on the part of CYS or any omission by the Court. CYS exercised its right to object to the jurisdiction of the Master. That action resulted in the scheduling of a hearing before the court within the required six month period. The hearing was continued slightly outside that period based on a reasonable request for a continuance made by the guardian *ad litem* that was granted by the Court. Further, after the hearing began, Mother (and Father) was given two hearing days of

26

opportunity to question witnesses and present evidence. Finally, Mother has not alleged any prejudice and none is shown in the record. Under these facts, and considering the overall circumstances of this case, we discern no unreasonable act or omission on the part of CYS and no error or abuse of discretion on the part of this Court.

Mother next asserts that CYS did not make reasonable efforts because the agency did not asses her home. However, for the reasons discussed above, we do not consider Mother's current home and home plan to be suitable for T.W. In addition, Mother has not progressed to the point where she has demonstrated the necessary protective capacities for T.W. to be returned to her. In addition, her volatile relationship with Father continues. As a result, and given the other circumstances of this case, we see no error on the part of CYS in declining to assess Mother's home at this time.

Mother's final reasonable efforts challenge is that CYS unreasonably switched Mother's visits back from community visits to visits at the agency. However, given the facts and circumstances discussed above, especially the safety issues that remain, we believe that CYS acted reasonably in moving visits back to the agency at the time the change was made.

In her final assignment of error, Mother almost unbelievably contends that "[t]he trial court erred by relying upon allegations of domestic violence between Mother and Father. " (Mother's 1925(b) Statement, Paragraph 8). This assignment of error merits no response beyond the following statement: Given the facts and circumstances of this case, we obviously did not err in considering the history of

27

domestic violence between Mother and Father. Quite to the contrary, it would have been beyond a gross abuse of our discretion to have ignored the history.

For these reasons, we believe that our goal change order effectuated the health, safety, needs, welfare, and best interests of T.W. and should be affirmed.

Date:  4/11/14

_____
Jonathan Mark, J.

Cc:    Superior Court of Pennsylvania
       Jonathan Mark, Judge
       Donald M. Leeth, Esq.
       Eric L. Hamill, Esq.
       Elizabeth B. Weekes, Esq.
       Lori J. Cerato, Esq.
       Brett J. Riegel, Esq.

CLERK OF COURTS
2014 APR 11 PM 1 16
MONROE COUNTY, PA

28