J-S60015-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: A.A., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| APPEAL OF: K.D.A., MOTHER | |
| | No. 1006 EDA 2016 |

Appeal from the Order Entered March 7, 2016
In the Court of Common Pleas of Wayne County
Civil Division at No(s): CP-64-DP-2-2014

BEFORE:  SHOGAN, OTT, and STRASSBURGER,* JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED DECEMBER 01, 2016**

Appellant, K.D.A. ("Mother"), appeals from the permanency review order dated February 24, 2016, and entered on March 7, 2016, changing the permanency goal for her son, A.A. ("Child") (born in November of 2009), to adoption and changing his concurrent goal to subsidized permanent legal custodian ("SPLC"), pursuant to section 6351 of the Juvenile Act, 42 Pa.C.S. § 6301-6365.  We affirm.

We summarize the procedural history of this case as follows.  On January 17, 2014, Children and Youth Services ("CYS" or the "Agency") filed an emergency petition for protective custody regarding Child.  The trial court granted the petition and placed Child in foster care.  On January 21, 2014,

---

* Retired Senior Judge assigned to the Superior Court.

CYS filed a petition for shelter care, which the trial court also granted. On February 19, 2014, the trial court adjudicated Child dependent pursuant to 42 Pa.C.S. § 6302(1). The trial court then held permanency review hearings on March 31, 2014, June 25, 2014, and September 2, 2014. In an order on September 11, 2014, the trial court found aggravated circumstances as to Child's father, M.S. ("Father"). The trial court held subsequent permanency review hearings on November 25, 2014, February 4, 2015, March 18, 2015, and July 27, 2015. On July 27, 2015, the trial court suspended Child's visitation with Mother and W.A. ("Maternal Grandfather") until a therapist could introduce Child to Father. Thereafter, the trial court held a permanency review hearing on September 15, 2015. On December 10, 2015, Child's guardian *ad litem* ("GAL") filed a motion for the appointment of legal counsel for Child, and the trial court appointed Attorney Michael Lehutsky as counsel for Child.

The trial court held a permanency review hearing on February 23, 2016. At the hearing, CYS presented the testimony of its Assistant Director, Amy Bass. Mother testified on her own behalf and presented the testimony of Maternal Grandfather. Father testified on his own behalf and presented the testimony of his mother, D.S. ("Paternal Grandmother").

In an order dated February 24, 2016, and entered on March 7, 2016, the trial court changed Child's permanency goal to adoption, and his concurrent goal to SPLC. On March 28, 2016, Mother filed a timely notice of

appeal and concise statement of errors complained of on appeal, along with a concise statement, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Initially, the trial court failed to file an opinion with its order and/or a Pa.R.A.P. 1925(a) opinion. On September 12, 2016, this Court entered a judgment order directing the trial court to provide an analysis of the factors under section 6351(f) and (f.1) of the Juvenile Act, within thirty days. In compliance with this Court's judgment order, on October 17, 2016, this Court received a supplemental record that included the trial court's "Amended Statement of Reasons Opinion" filed on October 11, 2016, setting forth its analysis of the factors in 42 Pa.C.S. § 6351(f) and (f.1) as applied to the evidence in this case.[1] This matter is now ripe for our disposition.

Mother presents the following issue for our review:

Whether the trial court below erred as a matter of law and/or abused its discretion in Ordering a Goal Change from Reunification to Adoption after first having suspended Mother's visitation with (A.A.) seven (7) months earlier?

Mother's Brief at 5.

Mother argues that the trial court erred in first suspending her visitation with Child on July 27, 2015, and then, after barring her from contact with Child, approving CYS's request for a goal change from

---

[1] We note the trial court opinion of October 11, 2016, contains apparent clerical errors in several places by indicating the date of the permanency hearing was February 24, 2016, rather than the correct date of February 23, 2016.

- 3 -

reunification to adoption. Mother's Brief at 9. Mother concedes that her record of compliance in this case may have been poor, but she contends that the trial court's July 27, 2015 order is unsupported. *Id*. at 13. Mother posits that the trial court could have suspended Father's visitation, and provided more time for Mother to improve her parenting skills and show the effect of her rehabilitation and her "re-found" ability to care for Child. *Id*. at 15. Accordingly, Mother contends that the trial court erred in first suspending her visitation in July of 2015, and then, after seven months of allowing CYS to stand between Child and Mother, changing Child's permanency goal to adoption. *Id*. at 15-17.

The Pennsylvania Supreme Court recently set forth our standard of review in a dependency case as follows:

> "The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." *In re R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). We review for abuse of discretion[.]

*In Interest of: L.Z.*, *A Minor Child*, 111 A.3d 1164, 1174 (Pa. 2015). Regarding the definition of an abuse of discretion, our Supreme Court has instructed the following:

> As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

- 4 -

*In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012) (citations omitted).

Section 6302 of the Juvenile Act sets forth definitions for various words and phrases and defines a "dependent child," in relevant part, as follows:

[a] child who:

(1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S. § 6302. In *In re G., T.*, 845 A.2d 870 (Pa. Super. 2004), this Court clarified the definition of "dependent child" as follows:

The question of whether a child is lacking proper parental care or control so as to be a dependent child encompasses two discrete questions: whether the child presently is without proper parental care and control, and if so, whether such care and control are immediately available.

*Id.* at 872 (internal quotations and citations omitted). Additionally, we note that "[t]he burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets that statutory definition of dependency." *Id*.

With regard to the disposition of a dependent child, in *In re D.A.*, 801 A.2d 614 (Pa. Super. 2002) (*en banc*), this Court explained the following:

[A] court is empowered by 42 Pa.C.S. § 6341(a) and (c) to make a finding that a child is dependent if the child meets the statutory definition by clear and convincing evidence. If the court finds that the child is dependent, then the court may make

an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S. § 6351(a).

*Id.* at 617.

When considering a petition for goal change for a dependent child, the trial court considers:

the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

*In re A.K.*, 936 A.2d 528, 533 (Pa. Super. 2007) (citing 42 Pa.C.S. § 6351(f)).

Regarding the disposition of a dependent child, section 6351(e), (f), (f.1), and (g) of the Juvenile Act provides the trial court with the criteria for its permanency plan for the subject child. Pursuant to those subsections of the Juvenile Act, the trial court is to determine the disposition that is best suited to the safety, protection and physical, mental and moral welfare of the child.

Section 6351(e) of the Juvenile Act provides, in pertinent part, as follows:

**(e) Permanency hearings.-**

(1) [t]he court shall conduct a permanency hearing for the purpose of determining or reviewing the permanency plan of the child, the date by which the goal of permanency for the child might be achieved and whether placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child. In any permanency hearing held with respect to the child, the court shall consult with the child regarding the child's permanency plan in a manner appropriate to the child's age and maturity. . . .

(2) **If the county agency or the child's attorney alleges the existence of circumstances and the court determines that the child has been adjudicated dependent, the court shall then determine if aggravated circumstances exist. If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the child's parent, guardian or custodian or to preserve and reunify the family shall be made or continue to be made and schedule a hearing as provided in paragraph (3).**

42 Pa.C.S. § 6351(e)(1), (2) (emphasis added).

Section 6351(f) of the Juvenile Act prescribes the following pertinent inquiry for the reviewing court:

**(f) Matters to be determined at permanency hearing.-**

At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4)   The appropriateness and feasibility of the current placement goal for the child.

(5)   The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6)   Whether the child is safe.

(7)   If the child has been placed outside the Commonwealth, whether the placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child.

* * *

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

> (i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

> (ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

> (iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or

custodian within the time frames set forth in the permanency plan.

* * *

**(f.1)** **Additional determination.-** Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1) If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(3) If and when the child will be placed with a legal custodian in cases where return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(4) If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(5) If and when the child will be placed in another living arrangement intended to be permanent in nature which is approved by the court in cases where the county agency has documented a compelling reason that it would not be best suited to the safety, protection and physical, mental and moral welfare of the child to be returned to the child's parent, guardian or custodian, to be placed for adoption, to

be placed with a legal custodian or to be placed with a fit and wiling relative.

**(f.2) Evidence.-** Evidence of conduct by the parent that places the health, safety or welfare of the child at risk, including evidence of the use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk, shall be presented to the court by the county agency or any other party at any disposition or permanency hearing whether or not the conduct was the basis for the determination of dependency.

**(g) Court order.- On the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.**

\* \* \*

42 Pa.C.S. § 6351 (emphasis added).

In addition, on the issue of a placement goal change, this Court has

stated:

When a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. **See In re Sweeney**, 393 Pa. Super. 437, 574 A.2d 690, 691 (1990) (noting that "[o]nce a child is adjudicated dependent . . . the issues of custody and continuation of foster care are determined by the child's best interests"). Moreover, although preserving the unity of the family is a purpose of [the Juvenile Act], another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1.1). Indeed, "[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child." **In re E.F.V.**, 315 Pa. Super. 246, 461 A.2d 1263, 1267 (1983) (citation omitted).

**In re K.C.**, 903 A.2d 12, 14-15 (Pa. Super. 2006).

- 10 -

Our painstaking review of the record reflects the following evidence, which supports the trial court's determination of a goal change to adoption in this matter. At the February 23, 2016 hearing, Ms. Bass testified that Child was presently six years old and had been in placement since he was four years old. N.T., 2/23/16, at 6. Mother did not provide her permanent address, which is in New Jersey, until September 2, 2014, following a permanency review hearing. *Id*. Father initially provided an address in Glen Burnie, Maryland, but, on February 9, 2016, Father provided an address in Baltimore, Maryland. *Id*. at 7. Ms. Bass explained that CYS had requested Father's address since the December 28, 2015 denial of an Interstate Compact for the Placement of Children ("ICPC") application as to Father. *Id*.

Ms. Bass further testified that on January 17, 2014, CYS received a telephone call from New Jersey Department of Youth and Family Services ("DYFS") informing CYS that Child was in New Jersey at the home of Maternal Grandfather. N.T., 2/23/16, at 7. Ms. Bass indicated that, before CYS could investigate the report, an incident occurred involving Child's maternal aunt, D.A. ("Maternal Aunt"), and Child in New Jersey. *Id*. at 7-8. Mother alleged that Maternal Aunt had kidnapped Child. *Id*. at 8. The police became involved, and New Jersey's DYFS reported that Child was safe that night. *Id*. at 8. CYS obtained the order for protective custody and went to Maternal Aunt's home to retrieve Child. *Id*. Maternal Aunt was under the influence of several substances, and Child was in a car with three other

women who were about to leave the premises when the police apprehended them. At the time of this incident, CYS knew Father's identity, but paternity had not yet been established. *Id*. In 2014, CYS had asked Father to take a paternity test, to which he submitted in December of 2014 or January of 2015. *Id*. at 8-9.

Child is currently placed at the home of B.H. and R.M. ("Foster Parents") in Waymart, Pennsylvania. N.T., 2/23/16, at 9. Child is doing very well and participates in all family activities. *Id*. Child has a consistent routine and sleeps and eats well. *Id.* However, within the six to eight months prior to the February 2016 hearing, Child began having emotional outbursts, had behavioral problems, was crying, and had regressed. *Id*. at 9-10. Child's regression was a concern to CYS. *Id*. at 10. Ms. Bass testified that Child is in the least restrictive placement that meets his needs at this time. *Id*. CYS believes that there is a continuing necessity for Child's placement, the placement is appropriate, and Child is safe in his placement setting. *Id*.

Ms. Bass testified that, in regards to the "reasonable and prudent parents' standard," Child is in an out-of-home placement that allows [him] to benefit. N.T., 2/23/16, at 10. CYS believes that Foster Parents are following the "reasonable and prudent parents" standard, because they have both been trained in that standard. *Id*. at 10-11. Child told Ms. Bass that he participates in regular, ongoing opportunities to engage in appropriate

- 12 -

activities, including fishing, bicycling, sledding, going to Foster Parents' barn, and learning to maneuver a new family-owned drone. *Id*. at 11. Child does not face any barriers in participating in those activities. *Id*.

The visitation for both Mother and Father had previously been suspended by court order at the time of the February 23, 2016 hearing. N.T., 2/23/16, at 11. At the initial time of Child's placement, Mother was offered bi-weekly visitation, but she did not want that type of visitation. *Id*. After CYS scheduled bi-weekly visitation more regularly, Mother had inconsistent attendance with the visitation. *Id*. Father denied paternity for one year. *Id*.

In March of 2015, CYS sought a goal change at a permanency review hearing, and the trial court denied the request. N.T., 2/23/16, at 12. Mother's bi-weekly, supervised visits continued at the Agency office, and Father was to begin a reunification plan that would include visitation. *Id*. Prior to the suspension of the parents' visitation, neither parent had ever progressed to unsupervised visitation. *Id*. Initially, Father had three visits in a therapeutic setting and later progressed to supervised visitation at the Agency office. *Id*.

Child had not seen Mother since July of 2015. N.T., 2/23/16, at 12. Child last saw Father in December of 2015. *Id*. at 12-13. Ms. Bass testified that CYS was seeking a change to the visitation and that CYS wanted to have the goal changed to adoption. *Id*. CYS sought to consult with a

therapist as to closure visitation, and for the visitation schedule to be vested in the entire treatment team, if the goal change to adoption was granted. *Id*. at 13.

Ms. Bass testified that, at the time of initial placement, Child was in pre-school. N.T., 2/23/16, at 13. He was likewise in school at the time of the hearing. *Id*. At the time of initial placement, Child was behind his age group in typical behaviors for a four-year-old. *Id*. He could not identify colors, did not know his numbers or the alphabet, had speech delays, and could not count past three. *Id*. Child then became involved in an "early intervention" program, and he exhibited success and was ready to begin kindergarten in a regular classroom on time. *Id*. at 14. He progressed very well in school and enjoyed it. *Id*. Child was eager to learn, and he was a model student. *Id*. He was not involved in special education. *Id*. Child's report card reflected at least satisfactory proficiency, and one "N" for "needs improvement" in holding his pencil. *Id*. at 14. As of the hearing on February 23, 2016, Child had exceeded the expectations for fluency and reading for an end-of-year kindergarten student. *Id*. at 15.

Child was participating in counseling. N.T., 2/23/16, at 15. At the time of his initial placement, he did not have a counseling requirement, but, with the need to introduce Father, counseling became necessary because Child had not known Father. *Id*. Although Child had seen Father while he was a baby, he was unaware of him. *Id*. As a result of the requirement for

reunification, CYS initiated therapy. *Id*. Child's therapy was through Friendship House, and began with Child's individual sessions with Kim Osbourne. *Id*. Ms. Osbourne also had a few individual sessions with Father, and then she had three joint sessions with Child and Father. *Id*. After the joint sessions, Child continued individual therapy with Ms. Osbourne. *Id*. When Ms. Osbourne left Friendship House, CYS requested a subsequent therapist, Gloria Bluett, through the Aaron Center in Dickson City. *Id*. at 16. Child's counseling with Ms. Bluett began in January of 2016, and was going well, but he was still building a rapport with her. *Id*. Ms. Bluett was waiting for the outcome of the hearing to know what direction/goals to set. *Id*. With regard to the progress of counseling, CYS had seen a marked change in Child, who looked forward to going to this counseling and eagerly would get in the car and attend without incident. *Id*.

Child was healthy but on multiple medications for allergies and asthma. N.T., 2/23/16, at 16-17. When Child came into placement, he did not have any medications for either asthma or allergies, and he had not seen a dentist. *Id*. at 17. CYS arranged for Child to see an allergist. *Id*. He had the allergen prick tests and, by process of elimination and ruling in, medical professionals have been able to identify Child's allergies. *Id*. Child sees Highland Physicians as his primary care provider. *Id*. at 17. A dentist filled eight cavities in Child's teeth. *Id*. at 18.

CYS identified Child's extended family and attempted to contact multiple family members by letter. N.T., 2/23/16, at 18. CYS has determined that additional family finding efforts no longer serve Child's best interest. *Id*. CYS developed a permanency plan for Child, dated February 1, 2014, which is appropriate and feasible. *Id*. at 19. Ms. Bass testified that Child was in substantial compliance with his objectives of the plan: obtaining and maintain good health and consistency of care; attending medical appointments; having his needs met; and attending age appropriate services and programs to prepare him for success in kindergarten. *Id*. at 19-20. Ms. Bass testified that Child had made full progress in alleviating the circumstances of his original placement. *Id*.

Mother's objectives were to provide CYS with her address; become and remain a law-abiding citizen; remain clean and sober; attend a drug and alcohol evaluation, and follow all recommendations; attend counseling and Narcotics Anonymous; and submit to and test negative on random urine screens. N.T., 2/23/16, at 20. Mother was also to attend a parent fitness evaluation and follow all recommendations; maintain a safe and stable living environment; obtain and maintain steady employment; comply with court orders and recommendations; and establish her state residency. *Id*. at 20-21. Additionally, Mother was to ensure that Child received and attended programs to be successful in school; attend his medical appointments and follow through with providers; not allow individuals under the influence of

illegal substances or alcohol or who are inappropriate to care for Child; and to ensure that Child's needs are met, *i.e.*, hygiene, sleeping, and clothing. *Id*. On June 11, 2015, additional objectives for Mother were added: complying with rules and recommendations of the inpatient rehabilitation Mother was attending, and to cooperate with probation. *Id*. at 21.

At each of the permanency review hearings, the trial court found that Mother had failed to comply with CYS recommendations. At the hearing on July 27, 2015, on a motion to amend visits, the trial court did not address Mother's compliance, and her visits were suspended at the hearing. At the permanency hearing on September 15, 2015, the trial court found Mother's compliance was minimal. N.T., 2/23/16, at 21. Ms. Bass testified that Mother's compliance was minimal as of February 23, 2016. *Id*. at 22.

Mother completed an inpatient rehabilitation program prior to September 15, 2015, and had begun intensive outpatient rehabilitation, but dropped out. N.T., 2/23/16, at 22. Mother attended forty-nine meetings in the 162 days since the previous hearing, for a 22% attendance rate, with two and three meetings sometimes held on the same day. *Id*. Mother submitted reports on urine screens, which were negative. *Id*. However, the screens were non-random (Mother could decide when to voluntarily provide the screen). *Id*. Mother's urine tested positive for morphine on February 23, 2016, the day of the hearing in this case. *Id*.

On November 13, 2014, Mother refused to provide a urine screen at Maternal Grandfather's home when CYS performed an unannounced visit. N.T., 2/23/16, at 23. Ms. Bass explained that, nearly two years later, Mother was still refusing to do a urine screen and had a compliance issue. *Id*. at 22-23. Mother attended a combination of both Alcoholics Anonymous and Narcotics Anonymous meetings. *Id*. at 23. Ms. Bass testified that Mother had made no progress toward alleviating the circumstance of Child's original placement over the course of the case. *Id*. Mother's compliance history was: June 2014, none; September 2014, none; November 2014, minimal; February 2015, minimal; March 2015, none; July 2015, visits suspended; September 2015, not addressed because the focus was shifted to reunification with Father. *Id*.

Father's permanency plan objectives were: cooperate with paternity testing; schedule, facilitate, and attend a parent fitness evaluation; engage in having a relationship with Child; accept financial responsibility for Child; and become actively involved in case planning and developing a "family tree" for possible resources for Child. N.T., 2/23/16, at 23-24. CYS added additional objectives to Father's permanency plan in 2015, as follows: ensure Child receives and attends programs to be successful in school; schedule and attend medical appointments and follow through with providers; not allow individuals under the influence of illegal substances or alcohol or who are inappropriate to care for Child; and ensure Child's needs

are met. *Id*. at 24. Father's objectives also included: be honest with the Friendship House therapist; follow all Friendship House recommendations; and be available for any and all visits and contacts requested by Friendship House and CYS regarding timeline and visitations. *Id*. Further, Father was required to: provide any and all documentation requested by the state; be open and honest with Maryland during the ICPC process; submit any and all clearances requested; and complete any and all paperwork and documentation in a timely manner. *Id*.

Ms. Bass characterized Father's present compliance with the permanency plan as minimal. N.T., 2/23/16, at 25. Father had four visits with Child between the permanency review hearing in September of 2015 and the hearing on February 23, 2016. *Id*. He brought Paternal Grandmother to one of the visits despite clear instruction not to bring anyone to the visits. *Id*. Father's communication with CYS was conflicting, and he would provide inconsistent information to team members, as well. *Id*. Father was not open and forthcoming about his extensive criminal history. *Id*. He missed all planned visits since November of 2015 except for the Christmas visit in December of 2015. *Id*. Father contacted CYS and requested that all visits stop because he would be busy with doctors' appointments, and was anticipating transportation problems. *Id*. The state of Maryland, Ann Arundel County Department of Social Services, denied Father's ICPC application on December 28, 2015, citing Father's multiple

arrests and convictions, including a history of misdemeanors, and several charges including assault. *Id*. at 25-26. Father also had three criminal charges resulting from two incidents, the dispositions of which were pending at the time of the hearing. *Id*. After an ICPC home study, the state of Maryland denied the ICPC because of Father's criminal history. *Id*. at 28.

Ms. Bass described Father's compliance with his permanency plan objectives as follows: June 2014, none; September 2014, none, aggravated circumstances, no reunification necessary; November 2014, none; February 2015, none; March 2015, moderate (because he was asked only to take a paternity test); July 2015, Father to increase his visitation (and Mother's visits suspended to allow Father untainted visitation time); September 2015, moderate; February 23, 2016, none. N.T., 2/23/16, at 28-29.

Ms. Bass characterized Father's present compliance as none, because the basis of any reunification is honesty, and Father had been dishonest; Father's ICPC application had been denied, so there could not be any placement in Maryland; Father's attendance at visits had been sporadic since October of 2015; and Father had requested that the visits stop. N.T., 2/23/16, at 29. Mother's ICPC application was also denied by the state of New Jersey in September of 2015. *Id*. Thus, at the time of the hearing, CYS was unable to place Child in the home of either parent. *Id*.

CYS made efforts toward finalizing Child's permanency plan including: providing emergency protective custody, shelter care, and ongoing foster care. N.T., 2/23/16, at 30. CYS also conducted DNA testing for Child on February 3, 2014; successfully maintained Child in one consistent, stable home throughout his placement; provided early intervention services and successful medical intervention to stabilize Child's health. *Id*. CYS also sought, and was granted, a finding of aggravated circumstances against Father in September of 2014, and DNA testing for Father on December 30, 2014. *Id*. In March of 2015, CYS sought a goal change for Child, which the trial court denied. *Id*. CYS then began reunification efforts with Father in April of 2015. *Id*. CYS began therapy with Child, and then Father, and continued their therapy jointly. *Id*. CYS completed the two ICPC applications, both of which were denied. *Id*. CYS provided supervised visitation with Mother, then suspended that visitation to allow Father's reunification to proceed. *Id*. CYS provided supervised visitation and therapy for Child and Father. *Id*. CYS completed Child's profile in November of 2014. *Id*. CYS had discussions with Foster Parents regarding their intention to adopt Child and their willingness to include the biological family members in Child's life. *Id*. CYS identified additional kin and sent letters inquiring about their interests in Child, and had discussions with some of those family members. *Id*. CYS also completed a home study regarding Maternal Grandfather. *Id*.

Maternal Grandfather expressed an interest in being a resource for Child, and Maternal Grandfather cooperated with a home study. N.T., 2/23/16, at 31-32. As a result of the home study, Maternal Grandfather was approved as a resource. *Id*. at 32-33. However, the ongoing caseworker and supervisor for Child making the placement decision did not recommend Maternal Grandfather for kinship placement. *Id*. at 33. Their main concerns regarding Maternal Grandfather were that he continued to be not only supportive of, but also aligned with, Mother, often not in Child's best interest. *Id*. Maternal Grandfather has a long history of minimizing, denying, and making excuses for Mother and her sister, Maternal Aunt, who continues to live close to Maternal Grandfather's home. *Id*. Maternal Grandfather responded to questioning with answers, such as "I don't ask questions, I just roll with it." *Id*. His responses suggested an inability to demonstrate protective capacities, which concerned CYS. *Id*. at 33-34. Additionally, during the six months preceding the hearing, CYS made consistent, unannounced visits to Maternal Grandfather's home for drug testing, and, on five occasions, Maternal Grandfather stated that he was unable to give a sample. *Id*. at 34. In the week preceding the hearing, Maternal Grandfather submitted to CYS drug testing, but had refused to submit to the drug testing at the unannounced home visits. *Id*. Maternal Grandfather submitted to drug testing at CYS's office on occasions that were not random. *Id*. On those occasions, when Maternal Grandfather was at

CYS's office to drop items off by himself or was with Mother, CYS would ask to drug test him. *Id*. In August of 2015, CYS advised Maternal Grandfather that he would not be considered as a placement for Child. *Id*. at 35.

At the time of the hearing, Child's permanency goal was to return home, but CYS did not believe that goal was feasible, and the date when returning home could be accomplished was undetermined. N.T., 2/23/16, at 35. CYS sought a goal change to adoption. *Id*. Ms. Bass testified that, with a goal change to adoption, the goal could be achieved within six months. *Id*. The concurrent permanency plan goal was adoption, and CYS wished for the goal to be changed to SPLC. *Id*. CYS was not seeking a determination of aggravated circumstances at the February 23, 2016 hearing. *Id*. at 36. Aggravated circumstances were previously determined to exist as to Father, but at the goal change hearing on March 24, 2015, CYS was required to make efforts with Father and to place Child in a timely manner. *Id*.

CYS had not made the necessary steps to finalize permanent placement for Child as of the February 23, 2015 hearing. N.T., 2/23/16, at 37. CYS needed to have the permanency goal changed to adoption with termination of parental rights, update the family profile, and finalize the process for adoption. *Id*. Ms. Bass testified that, if the goal were changed to adoption, CYS would file petitions for the termination of the parental rights of Mother and Father. *Id*. She stated that Foster Parents were willing

to adopt Child. *Id*. At the time of the hearing, Child had been in placement for twenty-six months. *Id*.

Ms. Bass testified that CYS recommended that Child remain in the temporary legal custody of CYS and in the physical custody of CYS for placement in his pre-adoptive foster home. N.T., 2/23/16, at 38-39. She stated that CYS had taken sufficient steps to ensure that Foster Parents are exercising the "reasonable and prudent parents" standard. *Id*. at 39. CYS has ensured that Child has been provided: regular, ongoing opportunities to engage in age-appropriate or developmentally appropriate activities, including consulting with Child about opportunities to participate, and identifying and addressing any barriers to participation. *Id*. CYS also ensured that: Child's GAL, Attorney Leatrice Anderson, continued as a special education decision-maker for Child; Child's educational, healthcare, and disability needs have been met; Child continues with his "504 plan" in school; and Child receives timely "well child" and "sick child" medical checkups and follow-up care, and continues in therapy. *Id*. Moreover, CYS ensures that all school records pertaining to Child, including enrollment documentation and special education documents, be released to CYS upon request. *Id*. CYS also ensures that visitation between Child and Mother occurs at the direction of Child's treatment team in order to facilitate closure visitation. *Id*. at 40. Additionally, CYS ensures that visitation between Child

and Father occurs at the discretion of Child's treatment team in order to facilitate closure visitation. *Id*.

Further, CYS sought for the trial court to determine that CYS satisfied the requirements regarding family finding, and that family finding no longer serves Child's best interests and should be discontinued. N.T., 2/23/16, at 40. CYS requested that Child's permanency goal be changed to adoption, his concurrent goal be changed to SPLC, and that CYS be authorized to proceed with any and all steps necessary to effectuate this goal in a timely manner, with a six-month review. *Id*. Ms. Bass testified that CYS believed that the recommendation was in Child's best interest, and Mother and Father were not in agreement with the recommendation of CYS. *Id*. She stated that Child indicated that he wished to remain with Foster Parents, who he called "Mom and Dad." *Id*. at 41. She testified that he printed their names, M-o-m and D-a-D for her, and his own name, and had a big smile on his face. *Id*.

Upon our careful review of the record, we conclude that the trial court's determinations are supported by the record. The trial court considered, *inter alia*, the continuing necessity for placement, compliance with the service plan, and the extent of progress in alleviating the circumstances that necessitated placement. 42 Pa.C.S. § 6351(f); *In re A.K.*, 936 A.2d at 533. The trial court concluded that changing the placement goal from return home to adoption was in Child's best interests.

42 Pa.C.S. § 6351(f.1); ***In re K.C.***, 903 A.2d at 14-15.  Mother's failure to comply with CYS recommendations or to make any demonstrable progress toward resolving issues which gave rise to placement constituted sufficient evidence to support Child's goal change to adoption.  Therefore, we discern no abuse of the trial court's discretion.  ***In Interest of: L.Z.***, ***A Minor Child***, 111 A.3d at 1174.  Accordingly, we affirm the trial court's order changing Child's permanency goal to adoption.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/1/2016